(No. 89984.—

AFM MESSENGER SERVICE, INC., Appellant, v.
THE DEPARTMENT OF EMPLOYMENT SECU-
RITY *et al.*, Appellees.

*Opinion filed September 20, 2001.—Rehearing denied
February 4, 2002.*

FREEMAN, J., took no part.

Robert S. Brody, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Darryl B. Simko, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE FITZGERALD delivered the opinion of the court:

In this appeal we consider whether delivery drivers for AFM Messenger Service, Inc. (AFM), were "independent contractors" within the meaning of section 212 of the Unemployment Insurance Act (820 ILCS 405/212 (West 2000)). In two separate administrative proceedings, the Department of Employment Security (Department) determined that the drivers were employees and

not independent contractors. AFM was, therefore, liable for unemployment insurance contributions. On administrative review, the circuit court confirmed. The appellate court, in a consolidated appeal, held that the agency decisions were not clearly erroneous and affirmed. 315 Ill. App. 3d 308. We granted AFM's petition for leave to appeal (see 177 Ill. 2d R. 315) and now affirm the judgment of the appellate court.

## BACKGROUND

### 1993 Agency Decision

In June 1990, a former clerical worker for AFM filed a claim for unemployment benefits, which triggered an audit of AFM by the Department. Among the individuals included in the audit were AFM's delivery drivers. The audit resulted in a determination and assessment against AFM for over $12,000 in unpaid unemployment insurance contributions for 1988 and 1989. AFM filed a protest and petition for hearing. AFM contended, in relevant part, that it was exempt from making unemployment contributions in connection with the drivers' services and compensation because the drivers were independent contractors under section 212. On January 26, 1993, a hearing was held before a representative of the Director of Employment Security (Director).

At the hearing, Susan Vitula, a co-owner of AFM, testified that AFM is a small-package same-day delivery service, which has been operating in the Chicago area since 1986. According to Vitula, all drivers must sign a contract, which AFM supplies. The brief, 10-line contract used by AFM during 1988 and 1989 provided that AFM and the named driver "agree to contract for the rendition of personal services as an independent broker/operator" and that "[i]t is understood [the driver] is acting as an independent contractor subject to all the necessary laws, procedures, etc., related to an indepen-

dent contractor, including, but not limited to, Federal and State Income taxes on his net income and any Self Employment, Unemployment, Minimum or any other taxes normally paid by an independent contractor."

Vitula also testified that, in accordance with the rules and regulations of the Illinois Commerce Commission (ICC), all drivers were required to enter into an equipment lease with AFM. The form of the equipment lease was provided by the ICC, and the required $25 ICC filing fee was paid by AFM. Pursuant to the lease, the named driver agreed to lease his or her vehicle to AFM for a period not to exceed three years. The lease also provided that AFM would compensate the driver on a weekly basis. The compensation would be computed as a percentage of the total revenue derived from operation of the leased vehicle. Vitula explained that the drivers were paid a "commission" based on the price of each delivery they completed. Most drivers were paid a 50% commission when they started. In order to receive their commissions, which were paid on Friday, drivers were required to drop off or mail their delivery tickets to AFM. Finally, Vitula testified that the drivers did not wear uniforms, and that when AFM offered the drivers a company baseball cap, many of the drivers declined.

Two drivers also testified on behalf of AFM. According to AFM's counsel, their testimony was representative of all AFM drivers during the years 1988 and 1989. Brian Lhotka testified that he learned about AFM through a friend, and in 1989 began making deliveries for AFM's customers. Typically, Lhotka would call AFM by 8 a.m. to let the dispatcher know that he was available for work. AFM could also reach him at home. According to Lhotka, he was not required to report to AFM every day, nor was he required to work a specific number of days or a specific number of hours per day. Lhotka, however, usually made himself available for work Monday through Friday; he

also made himself available for night deliveries, when the rates were higher. AFM did not assign a territory to Lhotka or limit the area in which he could work. AFM imposed no time constraints in connection with the deliveries, but Lhotka worked within the time constraints imposed by AFM's customers. AFM did not specify what route Lhotka should take to make the deliveries, and he was free to decline any delivery. Lhotka further testified that AFM issued no rules or regulations, conducted no training courses or meetings, and required no uniform. When AFM offered him a baseball cap with the AFM insignia, Lhotka declined.

Lhotka signed the form contract that AFM supplied, under which he was paid a 60% commission on deliveries. In order to get paid, Lhotka would turn in his delivery tickets to the AFM office. He usually did this when he was in the area and it was convenient to do so. Lhotka would sometimes pick up his check from the AFM office on Friday, or from the business next door to AFM where the checks were left. Lhotka testified that he considered himself an independent contractor and could terminate his services for AFM at any time without reason. He received no paid vacation time, no paid sick days, and no pension benefits from AFM. He was not eligible for any compensation other than his commission, and AFM did not deduct taxes from his commissions. Each year he worked as a delivery driver, he received an Internal Revenue Service Form 1099 (miscellaneous income) from AFM. As part of his 1989 federal tax return, Lhotka filed a Schedule C (profit or loss from business), showing approximately $20,000 of income from his messenger service business. Lhotka testified that although he had the right to work for other messenger service companies, in 1989 he performed delivery work solely for AFM. Lhotka further testified that his investment in his business consisted of the vehicle he owned;

the upkeep and maintenance on his vehicle, no part of which AFM paid; and the maps he purchased. AFM supplied Lhotka with a beeper and radio, for which he paid AFM a use fee. Although he had the right to hire, at his own expense, an assistant to help with deliveries, Lhotka never hired an assistant.

Lhotka also signed the required ICC lease with AFM. Pursuant to ICC regulations, Lhotka displayed two signs in his vehicle windows indicating that the vehicle was leased to AFM. When picking up packages and making deliveries, Lhotka indicated to the customer that he was with AFM.

Angelo Cisneros testified that he was a driver for AFM beginning in 1988. He learned about AFM through his brother, who also drove for AFM. Cisneros' testimony was generally consistent with Lhotka's testimony. Cisneros signed a contract with AFM, under which he was paid a 60% commission, and an ICC equipment lease. He considered himself an independent contractor. Cisneros testified that he was not required to report to AFM at any particular day or time, and that he was free to make his services available to AFM whenever he chose. Typically, services with AFM were initiated when AFM paged him, but Cisneros was free to refuse the pickup or delivery. According to Cisneros, AFM did not assign him a territory or limit the area in which he could work. AFM did not provide any rules or regulations. AFM did not require a uniform, and although AFM gave him a company baseball cap, he was not required to wear it. Cisneros displayed the required signs in his vehicle, indicating that it was leased to AFM, and he sometimes identified himself with AFM when making a pickup. AFM did not have the right to appoint or approve a helper for Cisneros.

On his income tax return, Cisneros reported that he was self-employed. Cisneros testified that his investment

in his business was his automobile, on which he paid the insurance, gas, repairs and maintenance, without reimbursement from AFM. Cisneros had his own beeper, but rented a radio from AFM. During 1988 and 1989, Cisneros testified that he also worked for his father, although the income was probably too small to report. In 1990, Cisneros' entire income was from AFM. Although Cisneros worked for other messenger companies, he only worked for one company at a time.

Following the hearing, the Director's representative determined that AFM had failed to sustain its burden of proof that the drivers were independent contractors under section 212. According to the representative, AFM had not established that the drivers were free from AFM's control and direction, as required under section 212(A); that the drivers' services were performed outside of the usual course or places of AFM's business, as required under section 212(B); and that the drivers were engaged in independently established businesses, as required under section 212(C). See 820 ILCS 405/212 (West 2000). The representative concluded that AFM was liable for unpaid unemployment insurance contributions. Significantly, the representative accepted AFM's argument that any payments to the drivers should be allocated two-thirds to rental of the drivers' vehicles, and one-third to wages. This allocation reduced AFM's liability from approximately $12,800 to approximately $6,400.

Over AFM's objection, the Director adopted the decision of the representative. On administrative review, the circuit court of Cook County confirmed the Director's decision as neither against the manifest weight of the evidence nor contrary to law.

### 1996 Agency Decision

In August and September 1994, Mark Przybylinski delivered packages for AFM's customers. In early 1996,

in connection with a prior claim for unemployment benefits made by Przybylinski, a claims adjudicator for the Department found that the wages paid to him by AFM could not be used to establish benefit credit. Przybylinski appealed this finding and a hearing before a referee was held on February 21, 1996.

At the hearing, Przybylinski testified that he learned about driving opportunities with AFM through a newspaper advertisement in the employment section. Prior to performing deliveries for AFM, the company asked him to spend four hours with another driver to learn the operation. During his brief association with AFM, he was required to call in daily to the AFM dispatcher, even when he was sick. AFM also gave Przybylinski a pager, so that AFM could contact him with changes in delivery instructions or advise him of additional items for pickup.

Przybylinski admitted that he signed a contract with AFM under which he would be considered an independent contractor. The contract that Przybylinski signed in 1994 was not the same contract used by AFM during 1988 and 1989. The 1994 contract stated in relevant part:

> "AFM *** is engaged in the general messenger service in the City of Chicago *** and desires to contract with Mark Przybylinski, hereinafter referred to as 'Contractor,' to deliver various items placed with AFM by its customers.
> * * *
> AFM agrees that it will advise Contractor of various items for delivery and said delivery shall be evidenced in the form of a ticket specifying the place to which, and the person or party to whom, such items are to be delivered. Contractor shall be free to accept or reject the item or items. In the event contractor elects to accept for delivery any item or items, then it is mutually agreed by and between the parties that the delivery of such items or items as [sic] shall be accepted in accordance with the following terms and provisions.
> 1. Contractor agrees to furnish a vehicle *** and *** a driver and all gasoline, oil, lubricants, tires and other ac-

cessories to such vehicle, and to perform all repairs and maintenance thereto. *** AFM shall not be responsible or liable to Contractor for any of the expense or cost of operation, maintenance, or repairs of such vehicle.

2. AFM will furnish to its customers delivery tickets with respect to each item to be accepted and delivered by Contractor. *** Contractor will be supplied with a statement by AFM each week which will identify each delivery completed by the Contractor, and the commission earned by the Contractor computed and based on the information contained in each delivery ticket.

3. It is hereby declared to be the express intention of each of the parties that the relationship created between them by this contract is that of employer-independent contractor. *** Contractor shall have the right to hire a person to assist Contractor in the delivery of any item or items. Contractor shall have all control, direction, and supervision with respect to the physical details of the work to be performed and the manner in which the work is performed. AFM shall not have the right to exercise any control, direction or supervision over Contractor except to prescribe the destination for the delivery of the item or items to be transported by Contractor, and Contractor shall be bound by delivery instructions from the customer. Contractor shall receive as compensation an agreed percentage of the fees paid by the customer to AFM.

4. *** Contractor further agrees to secure *** public liability and property damage insurance *** and to furnish AFM a copy of the policy ***.

5. *** The acceptance by Contractor of a delivery ticket will constitute conclusive evidence that deliveries by contractor shall be performed *** pursuant to the terms, conditions and provisions of this agreement.

6. This agreement may be terminated at any time by AFM or Contractor. ***"

Consistent with the provisions of the contract, Przybylinski testified that he paid his own automobile expenses and was required to maintain liability and property damage insurance. He also testified that he could choose his own route when making deliveries and could hire a helper at his own expense. He did not know whether he

could have rejected a delivery and did not know whether he could have worked for another company at the same time. Przybylinski did not remember signing an equipment lease, but recalls placing a sign in the window of his vehicle to gain access to loading docks. After two months, Przybylinski voluntarily stopped making deliveries for AFM. He gave AFM a week's notice and turned in his pager.

Susan Vitula of AFM testified that prospective drivers would initially spend time with an experienced driver to see if they really wanted to do this type of work. Drivers were not required to telephone AFM daily. Rather, those who wished to work on a given day would call and advise the AFM dispatcher. If there was a pickup in the driver's area, the dispatcher would give the driver the details. Drivers were free to refuse a delivery with no penalty, and were free to work for other companies. Drivers periodically turned in their delivery tickets, either in person or by mail. Payment to the drivers was based on an agreed percentage of the delivery charges. Pursuant to ICC regulations, drivers were required to sign equipment leases with AFM. AFM paid the ICC filing fee. As to Przybylinski's affiliation with AFM, Vitula testified that he never expressed dissatisfaction with the contract or the job, and that he left without notice, advising the company by telephone the same day that he took another job.

On March 15, 1996, the referee issued his decision. The referee concluded that AFM had failed to establish that Przybylinski was an independent contractor under the three criteria set forth in section 212. Accordingly, the wages paid to Przybylinski by AFM could be used to establish benefit credit. AFM appealed the referee's decision to the Board of Review (Board). The Board affirmed the referee's decision. On administrative review, the circuit court of Cook County confirmed the Board's deci-

sion as neither against the manifest weight of the evidence nor contrary to law.

## Appellate Review

The two cases were consolidated for appellate review. With one justice dissenting, the appellate court affirmed the judgment of the circuit court, which had confirmed the decisions of the Director and Board, agreeing that AFM had failed to establish that its drivers were independent contractors under section 212. 315 Ill. App. 3d 308.[1] We granted AFM's petition for leave to appeal. See 177 Ill. 2d R. 315.

## ANALYSIS

### Standard of Review

Before reaching the merits of this appeal, we must first determine the applicable standard of review. Judicial review of a decision of the Department is governed by the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2000)). 820 ILCS 405/1100, 2205 (West 2000). Under the Administrative Review Law, the scope of judicial review extends to all questions of law and fact presented by the record before the court. 735 ILCS 5/3—110 (West 2000). The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05 (1998); *Branson v. Department of Revenue*, 168 Ill. 2d 247, 265 (1995).

AFM maintains that the Department's decision presents a question of law and is subject to *de novo* review. See *Richard's Tire Co. v. Zehnder*, 295 Ill. App. 3d 48,

---

[1]For ease of discussion we will refer to the 1993 decision of the Director and the 1996 decision of the Board collectively as the Department's decision.

56-57 (1998). The Department maintains, however, that this case presents a mixed question of law and fact and that, pursuant to this court's decision in *City of Belvidere*, the more deferential "clearly erroneous" standard of review applies. We agree with the Department.

A mixed question of law and fact is one "involv[ing] an examination of the legal effect of a given set of facts." *City of Belvidere*, 181 Ill. 2d at 205. Stated another way, a mixed question is one "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or *** whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982); see also *Lutheran Church of the Good Shepherd v. Department of Revenue*, 316 Ill. App. 3d 828, 831-32 (2000); *Joel R. v. Board of Education of Mannheim School District 83*, 292 Ill. App. 3d 607, 612 (1997) (citing with approval the *Pullman-Standard* definition of mixed questions).

In *City of Belvidere*, this court reviewed an agency decision which presented a mixed question of law and fact. There, the labor relations board determined that the city had committed an unfair labor practice when it refused to bargain with the firefighters union over the city's decision to contract out paramedic services to a private company. Under the Illinois Public Labor Relations Act, to bargain collectively meant "to negotiate in good faith with respect to wages, hours, and other conditions of employment." 5 ILCS 315/7 (West 1994). Thus, whether the city was obligated to bargain over this matter turned on whether the city's decision to contract out for paramedic services affected the "wages, hours and other conditions" of the firefighters' employment. We determined that the decision of the labor relations board was best considered a mixed question of law and fact. We explained:

"The Board's finding is, in part, factual because it involves considering whether the facts in this case support a finding that the City's decision affected wages, hours and other conditions of employment. Nevertheless, the Board's finding also concerns a question of law because the phrase 'wages, hours and other conditions of employment' is a legal term that requires interpretation." *City of Belvidere*, 181 Ill. 2d at 205.

In the present case, the Department's decision also presents a mixed question of law and fact. Its decision is, in part, factual because it involves considering whether the facts support the agency's finding that the AFM drivers are employees and not independent contractors under section 212. Nevertheless, the Department's decision also concerns a question of law because the three statutory requirements for independent contractor status set forth in section 212 (freedom from control and direction, performance of services outside the usual course or places of business, and establishment of an independent business) are comprised of legal terms and concepts requiring interpretation.

In *City of Belvidere*, we held that the standard of review applicable to agency decisions that present a mixed question of law and fact is the "clearly erroneous" standard. *City of Belvidere*, 181 Ill. 2d at 205. We described this standard of review as lying between the manifest weight of the evidence standard and a *de novo* standard, so as to provide "some deference" to the agency's decision. *City of Belvidere*, 181 Ill. 2d at 205. We did not, however, otherwise define this standard and did not explain where on the continuum between the manifest weight standard and *de novo* review the clearly erroneous standard lies. In applying this standard, our appellate court, including the appellate court panel in this case, has utilized the definition of "clearly erroneous" adopted by the United States Supreme Court in the context of Federal Rule of Civil Procedure 52(a) (Fed. R.

Civ. P. 52(a)). See *Carpetland U.S.A., Inc. v. Department of Employment Security*, 319 Ill. App. 3d 1068, 1073 (2000), *appeal allowed*, 195 Ill. 2d 576 (2001); *Rogy's New Generation, Inc. v. Department of Revenue*, 318 Ill. App. 3d 765, 770 (2000); *Board of Education of Community Consolidated School District No. 59 v. State Board of Education*, 317 Ill. App. 3d 790, 796 (2000); *Hormel Foods Corp. v. Zehnder*, 316 Ill. App. 3d 1200, 1205 (2000); *Randolph Street Gallery v. Zehnder*, 315 Ill. App. 3d 1060, 1064 (2000); 315 Ill. App. 3d at 312-13; *Friends of Israel Defense Forces v. Department of Revenue*, 315 Ill. App. 3d 298, 303 (2000).

Rule 52(a) provides in relevant part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a). In construing this rule, the Supreme Court has held that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948). See also *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 622, 124 L. Ed. 2d 539, 563-64, 113 S. Ct. 2264, 2279 (1993) (quoting with approval the *United States Gypsum Co.* definition of "clearly erroneous").

Review under the clearly erroneous standard of Rule 52(a) is "significantly deferential." *Concrete Pipe*, 508 U.S. at 623, 124 L. Ed. 2d at 564, 113 S. Ct. at 2280. The rationale for this deference "is not limited to the superiority of the trial judge's position to make determinations of credibility." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 529, 105 S. Ct. 1504,

1512 (1985). Rather, deference is accorded based on the "expertise" that comes with "experience" as the trial judge fulfills his or her major role as fact finder. *Anderson*, 470 U.S. at 574, 83 L. Ed. 2d at 529, 105 S. Ct. at 1512.

We note that the deference accorded a trial judge's experience and expertise under the federal rule is not unlike the deference accorded decisions of our administrative agencies. Indeed, this court has frequently acknowledged the wisdom of judicial deference to an agency's experience and expertise. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992) (explaining that a significant reason for giving substantial weight and deference to an agency's interpretation of an ambiguous statute is that "agencies can make informed judgments upon the issues, based on their experience and expertise"); *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 495-96 (1988) (noting that too much judicial intervention in an administrative action may interfere with the exercise of agency discretion and expertise); *Massa v. Department of Registration & Education*, 116 Ill. 2d 376, 388 (1987) (deferring to agency's expertise and experience and expressing a reluctance to tamper with an agency decision revoking a professional license); see also *Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 306 (1995) (requirement that a litigant exhaust administrative remedies before seeking judicial review permits the agency to use its special expertise in resolving the matter); *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 288 (1994) (under the doctrine of primary jurisdiction, a matter should be referred to an administrative agency when it has a specialized or technical expertise that would help resolve the controversy); *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 523 (1992) (labor relations board is "uniquely qualified" to

answer certain questions involving collective bargaining given its experience and understanding of the issues). Even when we have reviewed an agency's interpretation of a statute *de novo*, we have acknowledged that the agency's interpretation was "relevant." *Branson*, 168 Ill. 2d at 254. Further, when we adopted the clearly erroneous standard of review for mixed questions of law and fact, we again recognized the experience and expertise of the agency and indicated that the standard would be deferential to some degree. *City of Belvidere*, 181 Ill. 2d at 205.

Based on the foregoing, we conclude that the clearly erroneous standard of review, adopted in *City of Belvidere*, parallels in significant respects the clearly erroneous standard under the federal rules, and that the Supreme Court's definition of "clearly erroneous" provides a practical guide for the application of this standard. Accordingly, we hold that when the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed "clearly erroneous" only where the reviewing court, on the entire record, is "left with the definite and firm conviction that a mistake has been committed." *United States Gypsum Co.*, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542. That the clearly erroneous standard is largely deferential does not mean, however, that a reviewing court must blindly defer to the agency's decision. Indeed, in *City of Belvidere*, we reversed the decision of the administrative agency.

As a final matter, we note that this court has reviewed other decisions of the Department which raised issues similar to those present here under a manifest weight of the evidence standard. See *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 73 (1991); *Griffitts Construction Co. v. Department of Labor*, 76 Ill. 2d 99, 104 (1979); *Gladstone Cab Co. v. Donnelly*, 30 Ill.

2d 465, 474 (1964); *Spahn v. Department of Labor*, 25 Ill. 2d 482, 490 (1962); *Beth Weber, Inc. v. Murphy*, 389 Ill. 60, 67 (1945); *Murphy v. Daumit*, 387 Ill. 406, 412 (1944). These cases, however, predate *City of Belvidere*. Further, there is no indication in these cases that a party raised the possibility that the administrative decision under review may have presented a mixed question of law and fact. Here, the Department addressed that possibility. *Cf. Branson*, 168 Ill. 2d at 266 (where the parties to an administrative appeal did not address the possibility that the agency's determination may be a mixed issue of law and fact, and the parties assumed that a manifest weight of the evidence standard applied, the parties' contentions would be reviewed accordingly). We now consider the merits of this appeal.

Unemployment Insurance Act

The Unemployment Insurance Act (Act) (820 ILCS 405/100 *et seq.* (West 2000)), adopted in 1937, provides economic relief to those who are involuntarily unemployed, through the collection of compulsory contributions from employers and the payment of benefits to eligible unemployed persons. 820 ILCS 405/100 (West 2000); *Carson Pirie Scott & Co. v. State of Illinois Department of Employment Security*, 131 Ill. 2d 23, 28 (1989); S. Bernstein, *The Illinois Unemployment Insurance Act*, Ill. Ann. Stat., ch. 48, at XIX-XXI (Smith-Hurd 1986). Liability for contributions and eligibility for benefits is dependent, in part, on the existence of an "employment" relationship. The determination of whether such a relationship exists is not controlled by common law principles of master and servant and independent contractor. Rather, we must look to the statutory definitions, which are more inclusive than the common law. *Jack Bradley*, 146 Ill. 2d at 74; *Griffitts Construction*, 76 Ill. 2d at 103-04; *Spahn*, 25 Ill. 2d at 486; *Eutectic Welding Alloys Corp. v. Rauch*, 1 Ill. 2d 328, 332 (1953). Thus, a person who is

regarded at common law as an independent contractor may nonetheless be considered an employee under the Act. See *Jack Bradley*, 146 Ill. 2d at 74; *Rozran v. Durkin*, 381 Ill. 97, 101-04 (1942).

Under the Act, "employment" is defined in relevant part as "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 2000). "Employing unit" includes a "corporation," such as AFM, "which has or *** had in its employ one or more individuals performing services for it within this State." 820 ILCS 405/204 (West 2000). The expansive definition of "employment" is circumscribed by section 212 of the Act, which carves out an exemption for services performed by "independent contractors." Section 212 provides:

> "Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—
>
> A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and
>
> B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> C. Such individual is engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212 (West 2000).

Because the three conditions of section 212 are phrased in the conjunctive, all three conditions must be satisfied for the independent-contractor exemption to apply. *Jack Bradley*, 146 Ill. 2d at 75; *Griffitts Construction*, 76 Ill. 2d at 104; *Eutectic Welding Alloys*, 1 Ill. 2d at 332. In determining the existence of such an exemption, the terminology used by the parties in describing their relationship is not controlling, and there is a strict burden of

proof placed upon the party claiming the exemption. *Jack Bradley*, 146 Ill. 2d at 75-76; *Griffitts Construction*, 76 Ill. 2d at 104; see also 820 ILCS 405/2200 (West 2000) (burden is on the party contesting the determination and assessment of contributions by the Director to prove that it is incorrect); 820 ILCS 405/2303 (West 2000) (on judicial review of any decision of the Board or of any decision, order, ruling, determination and assessment, statement of benefit wages, statement of benefit charges, or rate determination made by the Director, the burden is on the person seeking such review). In addition, because the Act was passed with the public welfare in mind, its provisions should be liberally construed in favor of inclusion. *Jack Bradley*, 146 Ill. 2d at 75; *Griffitts Construction*, 76 Ill. 2d at 104; see also *Ross v. Cummins*, 7 Ill. 2d 595, 597 (1956) (exemption provisions of the Act are strictly construed against the party claiming the exemption).

The Department determined that AFM had failed to meet its burden as to all three conditions of section 212. Because the inability to satisfy any one condition will defeat an employer's claim for an independent-contractor exemption, we find it unnecessary to consider whether AFM satisfied all three conditions. Instead, we focus on the third condition, which requires that the drivers for AFM be "engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/ 212(C) (West 2000). As discussed below, we conclude that the Department's determination that AFM failed to satisfy this condition is not clearly erroneous.

In *Murphy v. Daumit*, 387 Ill. 406 (1944), we held that the Act contemplated that an individual engaged in an independent enterprise, under section 212(C), is one who "has a proprietary interest in such business to the extent that he can operate same without hindrance from any individual whatsoever and whose business also is

free from control." *Daumit*, 387 Ill. at 417. *Daumit* involved the status of salesmen who sold vacuum cleaners door-to-door for the Chicago distributor of a vacuum cleaner manufacturer. The manufacturer set the price of the cleaners, and the distributor set the credit terms. The time-payment contracts, under which the cleaners were bought, were subject to the approval of the distributor and were the distributor's property. The salesmen received $25 on each sale, less any trade-in allowance. The distributor did not set the salesmen's hours or territory and paid no expenses. The distributor provided the salesmen several days of personal training in how to handle sales, credit arrangements and authorized statements, and conducted sales meetings at his office once or twice a week. Salesmen reported on the number of demonstrations they conducted. They were also required to follow up on customer complaints and to report to the distributor on how the matter was handled. If a salesman did not show up for an unusual length of time, he was requested to turn in his machine and terminate his relationship. Although the salesmen could carry other lines of cleaners, there was no evidence that any of them did so.

On this record we concluded that the salesmen acted only as the representative of the distributor, taking orders in the distributor's name, subject to the distributor's approval and not for themselves as independent contractors. *Daumit*, 387 Ill. at 416. The salesmen, in effect, "had no business to sell or give away." *Daumit*, 387 Ill. at 417. Their endeavor existed only by reason of their employment by the distributor, which was subject to termination, at which time the salesmen were unemployed. *Daumit*, 387 Ill. at 417.

We applied our holding in *Daumit* most recently in *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61 (1991). As part of its advertising and

public relations business, Jack Bradley provided food demonstrators for food vendors or retailers. Through advertising and referrals, the company maintained a list of over 200 food demonstrators. Approximately 20% of Jack Bradley's business was derived from the provision of such demonstrators. Before being placed on the company's list of available demonstrators, the individual signed a written contract provided by the company which stated the hourly rate of pay, that the individual was an independent contractor, and that the individual had sole control over the manner and means of performing the service.

Typically, a food vendor or retailer would contact Jack Bradley regarding a food demonstration that the vendor or retailer wished to schedule. Jack Bradley took the details and contacted demonstrators on its list to try to fill the job. A demonstrator could refuse the job for whatever reason, without penalty. If a demonstrator accepted the job, Jack Bradley forwarded a confirmation slip and time sheet to the demonstrator. On the scheduled date, the demonstrator would report to the designated location, usually a supermarket. Supplies were provided by the food vendor, the retailer, or the demonstrator. Jack Bradley provided no training, but provided the demonstrators with any food preparation and demonstration guides received from the vendors. If the demonstrator's job was unsatisfactory, Jack Bradley simply ceased calling that demonstrator. The store manager signed the demonstrator's time sheet, which the demonstrator submitted to Jack Bradley for payment. Demonstrators were paid twice per month. Jack Bradley did not deduct payroll taxes.

We acknowledged our long-held view that the test for an independently established business under section 212(C) is that the employee's "business" be capable of operation without hindrance from any other individual.

*Jack Bradley*, 146 Ill. 2d at 78, citing *Daumit*, 387 Ill. at 417. That is, the employee's entrepreneurial enterprise must enjoy a "degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services." *Jack Bradley*, 146 Ill. 2d at 78, quoting with approval *Sample & Sell, Inc. v. Labor & Industrial Relations Comm'n*, 764 S.W.2d 109, 112 (Mo. App. 1988). We concluded that the evidence revealed no proprietary interest of the food demonstrators in any food or product demonstration business, and that the evidence did not show that the demonstrators were able to operate largely without the benefit of a relationship with Jack Bradley or another "demo" company. *Jack Bradley*, 146 Ill. 2d at 80-81. The fact that the demonstrators could work for other "demo" companies was not dispositive. Such other relationships may simply have been like the demonstrators' relationship with Jack Bradley—part-time employment. *Jack Bradley*, 146 Ill. 2d at 80. We noted, too, that Jack Bradley, rather than each demonstrator, provided the written contract which the parties signed, and that Jack Bradley, rather than each demonstrator, determined the rate of payment. *Jack Bradley*, 146 Ill. 2d at 80.

Similarly, in the present case, the evidence did not demonstrate that the drivers were able to operate their "delivery businesses" without the benefit of a relationship with AFM, or another messenger service company like AFM. AFM procured the customers; AFM set the delivery prices; AFM provided the delivery tickets to the customers; AFM made the delivery assignments; AFM billed the customers; AFM set the commission rate; AFM paid the drivers. AFM also retained the right, under the parties' written agreement which AFM supplied, to terminate their relationship at any time. Thus, a driver's "business" was not established "independently" of AFM. Rather, a driver's business existed only by reason of the

driver's employment with AFM, which was subject to termination, at which time the driver would be unemployed.

The Missouri court of appeals applied essentially the same analysis when it determined that certain baggage delivery drivers were not independent contractors for purposes of the Missouri Employment Security Act. See *Koontz Aviation, Inc. v. Labor & Industrial Relations Comm'n*, 650 S.W.2d 331 (Mo. App. 1983). In that case, Koontz Aviation entered into a contract with certain airlines to deliver baggage to passengers when the baggage had not been available for the passengers to pick up at the airport. To make these deliveries, Koontz engaged a number of drivers who drove their own vehicles and paid their own expenses. Koontz paid the drivers 35% of the delivery charges, which were fixed by the airline.

The Missouri unemployment statute, like ours, provided a three-part test for the independent-contractor exemption. The third part of the test required that the individual be " 'customarily engaged in an independently established trade, occupation, profession or business.' " *Koontz Aviation*, 650 S.W.2d at 332, quoting Mo. Rev. Stat. § 288.034.5 (1978). The Missouri court concluded that Koontz Aviation failed to satisfy the requirements of the statutory exemption. The court noted that the drivers delivering baggage did so only by virtue of Koontz Aviation's contract with the airlines, and that the drivers could not have survived independent of their relationship with Koontz Aviation. *Koontz Aviation*, 650 S.W.2d at 334. See also *RX Delivery Service, Inc. v. Labor & Industrial Relations Comm'n*, 677 S.W.2d 936 (Mo. App. 1984) (holding that drivers engaged by RX Delivery Service to pick up and deliver packages for drug stores and medical centers were not independently established in the drug delivery business).

Further support for our conclusion in the instant

case is found in this court's earlier decisions in *Rozran v. Durkin*, 381 Ill. 97 (1942), and *Zelney v. Murphy*, 387 Ill. 492 (1944). In *Rozran*, the evidence indicated that the claimant, Sherman Kuehl, had an oral agreement with Cannonball Bonded Messenger Service (Cannonball) to make deliveries, for which he was paid 65% of the gross receipts. Although not required to do so, Kuehl reported to Cannonball early every morning. Kuehl was obligated to deliver the packages assigned to him by the dispatcher and to make pickups as ordered by the dispatcher, within certain definite time limits. There was no set territory, but Kuehl's activities were often confined to certain areas by the dispatcher. Kuehl was expected to return to Cannonball's office as soon as possible after making the required deliveries. Kuehl also collected C.O.D.'s on the packages and followed the same procedures for receipts and accounts as the ordinary employees of Cannonball. Kuehl provided his own truck, paid his own expenses, and although free to work for other companies, never did so. Kuehl's entire time was taken up delivering packages for Cannonball. We concluded, *inter alia*, that Cannonball failed to satisfy section 212(C) of the Act.

> "The very fact that Kuehl, upon being dismissed from the company, was out of employment, indicates that he was dependent upon his work for economic subsistence. Although he was allowed to serve for others, it is a fact that he never did so, nor did he have time to do so. His sole employment was in the service of the Cannonball company. His conduct was governed by the suggestion, direction and will of that company. The prices he received were those which Cannonball allowed to him, he having no part in the determination of the rates for the services rendered." *Rozran*, 381 Ill. at 105.

Here, too, the drivers' sole employment was in the service of AFM. The drivers' conduct was controlled by the suggestion and direction of AFM. The commissions the drivers received were those AFM allowed, the drivers playing no part in the determination of delivery rates.

AFM notes, however, that the driver in *Rozran*, unlike the AFM drivers, reported every day to the messenger service company, was obligated to accept delivery assignments from the dispatcher, and was expected to return to the office after making a delivery. These factual differences do not impact our analysis under section 212(C). Rather, such differences speak more directly to the issues of whether AFM satisfied the requirements of section 212(A) (freedom from control), and section 212(B) (performance of services outside the usual course or places of business). As noted earlier, we find it unnecessary to decide these issues.

*Zelney*, which involved drivers for Triangle Motorcycle Package Service (Triangle), parallels *Rozran*. The two drivers named in the appeal, Robert Robey and George Katana, worked under an oral agreement, pursuant to which they provided their own motorcycles and paid their own expenses. Other drivers were engaged under written agreements. Triangle paid the drivers 75% of the delivery receipts. Although there were no set hours, the drivers reported for work at Triangle's office between eight and nine in the morning. Triangle furnished the rate cards fixing the fees to be charged by the drivers and, upon receiving a telephone order from a customer, directed the drivers to go to certain designated places to pick up the packages. To expedite delivery and avoid duplication of efforts, the drivers sometimes brought the packages back to Triangle's office. Later, when a call came in for a pickup, the driver whose turn it was to answer the call would take the packages that needed to be delivered to the same general area. The owner's wife would also sort the delivery tickets corresponding to the held packages and would assign to the driver making the next pickup those deliveries going to the same area. The drivers frequently delivered C.O.D. packages, turning in all of the money to the company.

Triangle billed the customer and assumed the risk of noncollection. Although the drivers were at liberty to work for other persons, they never did. Based on these facts, which we found similar to the facts in *Rozran*, we held that it was evident that the Triangle drivers were employees under the Act and not independent contractors. *Zelney*, 387 Ill. at 504.

AFM maintains that the messenger service industry has changed in the almost 60 years since *Rozran* and *Zelney* were decided, noting the industry's present day use of vehicle leases, as required by the ICC, as well as the industry's use of independent contractor agreements. We agree that the industry is subject to increased regulation, and that the drivers and messenger service companies are perhaps more sophisticated in their dealings. We fail to see, however, in what way these developments have so changed the messenger service business that *Rozran* and *Zelney* should no longer be considered good law. Cannonball and Triangle provided small-package, same-day delivery service to their customers through the use of a centralized dispatch and a fleet of drivers. This is the same business in which AFM is engaged, notwithstanding its use of ICC leases and independent contractor agreements. Moreover, as the *Jack Bradley* case demonstrates, the nature of the analysis under section 212(C) has not changed in the intervening years. Accordingly, we reject AFM's argument that *Rozran* and *Zelney* are irrelevant to the issues before this court.

AFM also maintains that, under *United Delivery Service, Ltd. v. Didrickson*, 276 Ill. App. 3d 584 (1995) (*UDS*), its drivers should be deemed independent contractors. There, the record indicated that each driver entered into an equipment lease with the company for the use of the driver's automobile, as well as an independent contractor agreement, providing that the driver would receive 50% of delivery revenues. Drivers could earn additional

compensation by delivering the packages within 1½ hours. Drivers were compensated after returning customer-completed delivery tickets to UDS. Drivers were not required, however, to report to the UDS offices; all business could be transacted by mail. Some drivers received their delivery assignments by calling UDS, while others carried pagers and radios, which could be rented from UDS. Drivers set their own schedules and were free to accept or reject deliveries without repercussion. Drivers paid their own expenses, including gas and tolls, and could hire their own helpers. Drivers did not receive paid vacations or sick leave. Drivers could work for other delivery companies, and some did. On this record, the Department found that UDS was liable for unemployment insurance contributions for wages paid to its delivery drivers. On administrative review, the circuit court reversed the Department's determination and the appellate court affirmed. AFM notes that this court denied the Department's petition for leave to appeal from the appellate court decision in *UDS* (*United Delivery Service, Ltd. v. Didrickson*, 166 Ill. 2d 555 (1996)) and argues that, given the similarity between the facts in *UDS* and those present here, the same result should obtain.

Although appellate court opinions may provide some guidance, they are not binding on this court. *People v. Anderson*, 188 Ill. 2d 384, 390 (1999); *Goldberg v. Davis*, 151 Ill. 2d 267, 277 (1992). This is true even where this court has denied a petition for leave to appeal. The denial of a petition for leave to appeal is not tantamount to a decision by this court on the merits and carries no connotation of approval or disapproval. *People v. Ortiz*, 196 Ill. 2d 236, 257 (2001).

In any event, the *UDS* opinion does not persuade us that the Department's decision in the present case is clearly erroneous. The *UDS* opinion failed to consider *Rozran* and *Zelney*, the only published cases from this

court involving the status of messenger service drivers under section 212 of the Act, as well as the principles set forth in *Jack Bradley*. In determining that the requirement of section 212(C) had been met, the *UDS* opinion states, "There is no reason why they [the drivers] could not have performed the same services for other delivery agencies." *UDS*, 276 Ill. App. 3d at 589. The appropriate inquiry under *Jack Bradley*, however, is whether the drivers could have performed the same services independent of a relationship with UDS *or another such messenger service company*. See *Jack Bradley*, 146 Ill. 2d at 80. Thus, to the extent *UDS* conflicts with our decision today, it is hereby overruled. We express no opinion, however, as to the analysis in *UDS* concerning sections 212(A) and (B) of the Act.

Finally, AFM contends that it is exempt from the provisions of the Act because the commission paid to its drivers constitutes "rental income" under the ICC equipment leases, rather than wages to employees. See 315 Ill. App. 3d at 319 (Hartman, J., dissenting).

With respect to the Department's 1993 decision, the record indicates that the Director's representative accepted AFM's argument that payments to the drivers should be allocated two-thirds to rental of the drivers' vehicles and one-third to wages. This allocation, and other adjustments, reduced AFM's liability from approximately $12,800 to approximately $6,400. The Director adopted the representative's decision, including the modified allocation and assessment. AFM objected to the modified assessment, maintaining that the assessment for 1989 was still overstated by approximately $480. In addressing this issue in its initial circuit court brief, AFM expressed a "desire to avoid a protracted controversy not involving a large sum of money." Nonetheless, in its reply brief, AFM argued that the drivers' compensation was merely rental income. During oral argument in the

circuit court, AFM stated that it was "willing to accept" the assessment as revised by the Director's representative and declined to make any argument on this matter, despite inquiry by the circuit court. With regard to the Department's 1996 decision concerning Mark Przybylinski's claim for benefits, the record indicates that AFM never argued before the Department or the circuit court that the $726 paid to Przybylinski in 1994 should be allocated to rental income, as opposed to wages. Based on this record, we decline to address this issue on appeal. See *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) (party may not complain of error to which the party consented, or where to do so is inconsistent with the position taken by the party in an earlier proceeding); *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278 (1998) (issues and defenses not placed before the administrative agency will not be considered for the first time on administrative review); *James J. Hafele & Associates v. Department of Employment Security*, 308 Ill. App. 3d 983, 987-88 (1999) (issue employer did not raise in the administrative hearing or before the Board of Review of the Department of Employment Security would be deemed waived).

## CONCLUSION

For the reasons discussed above, we conclude that the Department's decision is not clearly erroneous and, therefore, affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE FREEMAN took no part in the consideration or decision of this case.