2018 IL App (1st) 173084

No. 1-17-3084

Opinion filed September 28, 2018

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| VESSELIN APOSTOLOV, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 17 CH 2200 |
| EDDIE T. JOHNSON, Superintendent of the Police of the City of Chicago, and THE CITY OF CHICAGO, | ) ) ) ) ) | Honorable Anna Helen Demacopoulos, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    The Chicago Police Department's standards deem ineligible an applicant for the position of police officer who "engaged in criminal conduct." At issue is whether bad decisions, some 20 years ago when plaintiff, Vesselin Apostolov, was 14-years-old, should cost him an opportunity of ever becoming a Chicago police officer, despite an exemplary record since then.

¶ 2    Although the Human Resources Board of the City of Chicago (Board) reinstated Apostolov to the eligibility list, Eddie Johnson, the Superintendent of the Police of the City of

Chicago (Superintendent), and the City of Chicago filed a petition for common law writ of *certiorari* asking the trial court to review the Board's decision. The trial court reversed, finding the Board's decision "clearly erroneous."

¶ 3 Apostolov appeals, arguing (i) juvenile criminal conduct is not disqualifying under the Chicago Police Department (CPD) standard at issue and (ii) the Board's decision to reinstate him to the eligibility list was not against the manifest weight of the evidence. We affirm. The CPD standard does not distinguish between juvenile and adult criminal conduct, so the Board's decision to reinstate Apostolov was clearly erroneous.

¶ 4                                    BACKGROUND

¶ 5 In 2014, Apostolov applied for a position as a probationary police officer with the CPD. In the personal history section of his application, Apostolov admitted that when he was 14 years old, he was adjudicated delinquent after pleading guilty for his involvement in several burglaries and thefts between June and September 1996. Apostolov stated that he and some friends broke into several semitrailers at Champion Recycling and Moran Transportation Company and took some Nerf guns. A few months after that, they entered Pepsi Company property and took five cases of soda, which they left near a fence, but took "points" from the cases. They returned to Pepsi Company twice, once taking fuel keys and tractor keys, and days later broke into several trucks, taking vending machine keys.

¶ 6 Elk Grove Village police charged Apostolov with two counts of burglary and three counts of theft. According to the police report, this was Apostolov's first arrest and his parents reported no behavioral problems, but he was referred to juvenile court based on the "numerous offenses and the extent of the damage done." Apostolov pled guilty, was adjudicated delinquent, ordered to pay $1000 in restitution, and sentenced to 30 hours of public service and one year of

probation. Apostolov claimed that he pled guilty because he was present when the burglaries occurred, but he denied personally taking anything.

¶ 7    The CPD maintains "Pre-Employment Disqualification Standards for Applicants for the Position of Police Officer." The relevant subsection, special order 14-01, titled "Disqualification Based on Criminal Conduct" provides

> "[a]n applicant will be disqualified from consideration for a police officer position if there is evidence that the applicant has engaged in criminal conduct, even if the applicant was never convicted of any criminal offense. It is the conduct itself, not the fact that the applicant was convicted, that makes the applicant unsuitable for employment. *** A record of conviction or an admission will be *prima facie* evidence that the applicant engaged in criminal conduct."

¶ 8    Based on special order 14-01 and a background check, in which the CPD obtained the Elk Grove Village police report, the investigator recommended that Apostolov be disqualified for the position of probationary police officer based on his criminal conduct. The CPD accepted the recommendation and asked the Department of Human Resources (Department) to remove Apostolov from the list of eligible candidates.

¶ 9    The Department notified Apostolov of his removal and that he could challenge the removal by requesting a hearing before the Board, which he did.

¶ 10   At the hearing, the investigator testified that she recommended Apostolov's disqualification. She reviewed the Elk Grove Village police report and noted Apostolov's admitted involvement in the burglaries and thefts between June and September 1996. She concluded that Apostolov had committed criminal acts of theft and burglary, which disqualified him under special order 14-01.

¶ 11    Apostolov testified he was a 14-year-old high school freshman at the time of the thefts and burglaries. At age 10, he had immigrated from Bulgaria and wanted to "fit in with the cool kids." He and two friends started hanging out by the railroad tracks in an industrial park in Elk Grove Village. They illegally entered property of Moran Transportation Company, Champion Recycling, and Pepsi Company and committed acts of burglary, theft, and vandalism. The crimes were "a stupid mistake." Since then he has not committed any burglaries or thefts and believes the experience "would definitely be a benefit for a police officer." Apostolov submitted seven character letters as evidence and called five character witnesses.

¶ 12    The hearing officer submitted a report to the Board recommending it uphold Apostolov's removal from the eligibility list, stating that "applicant's repeated involvement in these activities along with his guilty plea to the resulting criminal charges is a clear violation of the Pre-Employment Disqualification Standards."

¶ 13    After reviewing the hearing officer's report and hearing transcript, the Board rescinded the CPD's decision and reinstated Apostolov to the eligibility list. The Board acknowledged that the CPD "proved by a preponderance of evidence" that between June and September 1996, Apostolov and two friends committed acts of burglary, theft, and vandalism, which resulted in a guilty plea. But, the Board noted that at the time of his arrest, Apostolov was 14 years old, and "[a]lthough the wrong doing was serious, [his] youth and the fact that he has a clean record for the 20 year period since 1996 must be considered." The Board concluded that Apostolov's "action[s] and activities after the 1996 incident" indicate he "learned from the 1996 incident and is well-qualified for the position of Probationary Police Officer."

¶ 14    The Superintendent petitioned for a common law writ of *certiorari*, seeking reversal of the Board's decision. The Superintendent argued Apostolov's admitted and repeated criminal

acts disqualified him as a candidate under special order 14-01. The trial court agreed, reversing the Board's decision, which it found "clearly erroneous."

¶ 15                                     ANALYSIS

¶ 16                              Standard of Review

¶ 17     A common law writ of *certiorari* is a general method for obtaining circuit court review of administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law and provides for no other form of review. *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). The standards of review under a common law writ of *certiorari* basically mirror those under the Administrative Review Law. *Id.* We review the administrative agency's determination, not that of the trial court. See *Burris v. Department of Children & Family* Services, 2011 IL App (1st) 101364, ¶ 30. The findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill.2d 200, 210 (2008). We neither reweigh the evidence nor make an independent determination of the facts. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009).

¶ 18     The applicable standard of review depends on whether we must decide questions of fact, questions of law, or a mixed question of fact and law. *Cinkus*, 228 Ill. 2d at 210 (citing *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005)). Questions of law are reviewed *de novo*, while questions of fact are subject to a manifest weight of the evidence standard of review. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. Mixed questions of law and fact are subject to a clearly erroneous standard. A mixed question of law and fact examines "the legal effect of a given set of facts" or, stated another way,

whether uncontested facts satisfy the statutory standard. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005).

¶ 19    We agree with the Superintendent that application of special order 14-01 to juvenile criminal conduct presents a question of law subject to *de novo* review, while its specific application to Apostolov's conduct is a mixed question of law and fact, subject to a clearly erroneous standard of review. Apostolov asks us to apply a manifest weight of the evidence standard, but the question of whether Apostolov's 1996 juvenile conviction justifies his disqualification turns on an interpretation of special order 14-01, which is a question of law. See *Burris*, 2011 IL App (1st) 101364, ¶ 30 (interpretation of agency regulation is question of law).

¶ 20                            Juvenile Criminal Conduct

¶ 21    The Superintendent contends special order 14-01, which permits the CPD to disqualify applicants for criminal conduct, includes all criminal conduct and creates no exception for juvenile criminal conduct. Apostolov argues, however, that special order 14-01 is ambiguous and the Board properly used its discretion to find that the general public policy behind the juvenile justice system warrants not applying it to juvenile criminal conduct. That public policy, Apostolov contends, protects youth from "the stigma of criminality that could serve as an obstacle to becoming a productive member of society," making special order 14-01 unsuited to criminal conduct committed by a 14-year-old.

¶ 22    First, we address the Superintendent's contention that Apostolov waived the issue by not arguing it before the Board. See *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278 (1998). ("[i]n general, issues or defenses not placed before the administrative agency will not be considered for the first time on administrative review"). Apostolov's attorney argued before the hearing officer that (i) juvenile criminal acts differ from adult criminal acts,

(ii) juveniles are treated differently in the criminal system, and (iii) the CPD should consider the age of the applicant at the time he or she committed the criminal act. Thus, Apostolov has not waived the issue.

¶ 23 Contrary to Apostolov's assertion, the Board failed to address special order 14-01's application to juvenile criminal conduct or say anything about the policy underlying the juvenile justice system. The Board simply stated it was considering Apostolov's youth and clean record since 1996 in deciding his name should be returned to the eligibility list. We will address the issue, however, because if, as the Superintendent contends, special order 14-01 mandates disqualification for juvenile criminal conduct, the Board's decision cannot stand.

¶ 24 Turning to the merits, courts construe administrative rules and regulations under the same principles that govern the construction of statutes. Our primary objective is to ascertain and give effect to the drafters' intent. *CBS Outdoor, Inc. v. Department of Transportation*, 2012 IL App (1st) 111387, ¶ 27. The language of the regulation itself provides the most reliable indicator of an agency's intent. *Id.* " 'Where the language of the regulation is clear and unambiguous, we must apply it as written, without resort to extrinsic aids of statutory construction.' " *Id.* (quoting *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008)). A court may not depart from the plain language of a regulation by reading into it exceptions, limitations, or conditions that the agency did not express. *Gillespie Community Unit School District No. 7 v. Wight & Co.*, 2014 IL 115330, ¶ 37. As a general rule, we accord deference to the interpretation of a statute by the agency charged with its administration. *Shields v. Judges' Retirement System of Illinois*, 204 Ill. 2d 488, 492 (2003). But, an agency's interpretation does not bind us, and we will set it aside when it is erroneous. *Id.*

¶ 25    As noted, section IV(B) of the special order 14-01 states, in part, that "[a]n applicant will be disqualified from consideration for a police officer position if there is evidence that the applicant has engaged in criminal conduct, even if the applicant was never convicted of any criminal offense. It is the conduct itself, not the fact that the applicant was convicted, that makes the applicant unsuitable for employment."

¶ 26    Apostolov argues that the absence of any language about "juvenile criminal conduct" renders special order 14-01 ambiguous and requires reference to the purposes of the juvenile justice system, which leads to the conclusion that "criminal conduct" does not include crimes committed as a juvenile. The Superintendent argues that special order 14-01 is not ambiguous and the plain language of the term "criminal conduct" means all criminal conduct, whether committed as a juvenile or as an adult. The Superintendent contends that because the provision is unambiguous, we should apply it as written and not look to "extrinsic aids" to interpret its meaning. The Superintendent also contends neither the Board nor this court may read into the provision exceptions the agency did not express.

¶ 27    We agree with the Superintendent. A statutory provision is not ambiguous merely because the parties disagree on its meaning. *Castro v. Police Board*, 2016 IL App (1st) 142050, ¶ 32. Ambiguity exists where the statute's meaning cannot be discerned from its plain language or yields more than one interpretation by reasonably well-informed persons. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 395-96 (2003). Where a statute does not define the terms it uses, "the words used in a statute will be given their plain and ordinary meanings." *Holland v. City of Chicago*, 289 Ill. App. 3d 682, 686 (1997).

¶ 28    Under special order 14-01, the CPD automatically disqualifies applicants who have engaged in "criminal conduct." That provision makes limited exceptions based on certain factors,

including the seriousness, frequency and recency of the applicant's criminal conduct. For instance, section IV(B)(2)(B) of special order 14-01 provides that a felony is disqualifying but that a misdemeanor is only disqualifying if it occurred within the three years preceding application to the CPD or more than one time in an applicant's life. Notably, special order 14-01 does not make a distinction between adult and juvenile criminal conduct.

¶ 29    The CPD could have made an exception for juvenile criminal conduct but chose not to, and we will not read into it exceptions, limitations, or conditions that CPD did not express. See *Gillespie Community Unit School District No. 7*, 2014 IL 115330, ¶ 37. The absence of an exception does not render the provision ambiguous but only underscores that juvenile criminal conduct can be disqualifying. And, because the language of special order 14-01 is not ambiguous, we need not resort to extrinsic aids, like the public policy behind the juvenile justice system. See *CBS Outdoor, Inc.*, 2012 IL App (1st) 111387, ¶ 27.

¶ 30    Apostolov's alternative argument is that juvenile criminal conduct *should* not be automatically disqualifying because it conflicts with the recent trend toward treating juvenile offenders differently than adults and contradicts basic principles of the juvenile justice system, which seeks to reform young offenders and ensure that their efforts to rehabilitate and become productive members of society are not thwarted by the stigma of their criminal record. See Diane Geraghty, *Bending the Curve: Reflections on a Decade of Illinois Juvenile Justice Reform*, 36 Child. Legal Rts. J. 71 (2016); Elizabeth S. Scott, *"Children are Different"*: *Constitutional Values and Justice Policy*, 11 Ohio St. J. Crim. L. 71, 72 (2013) (explaining that recent Supreme Court cases support developmental approach to juvenile justice policy); Joy Radice, *The Juvenile Record Myth*, 106 Geo. L.J. 365 (2018) (discussing why juvenile delinquency records should not follow juvenile into adulthood). Apostolov asserts that a blanket prohibition on applicants who

engaged in criminal conduct as juveniles automatically eliminates a good candidate like him, who learned from his mistake and has avoided further involvement with the criminal justice system for 20 years.

¶ 31 The authority to define the disqualification standards lies solely with the CPD and the Superintendent, and we cannot amend special order 14-01's mandatory disqualifying language for criminal conduct, regardless of age. The mandatory disqualification of a candidate like Apostolov, who, as far as the record shows, has led an exemplary life apart from his brief brush with the law as a juvenile and is otherwise qualified to serve as a police officer, may cause the CPD to rethink the lack of any exception for decades-old juvenile adjudications and instead vest the Superintendent with the discretion to consider such factors as the age of the juvenile at the time of the crime, the number and types of juvenile offenses, and the applicant's achievements in the intervening years. But that decision lies with the CPD, not the Board.

¶ 32 We conclude that absent language in special order 14-01 to the contrary, the CPD may disqualify an applicant for juvenile criminal conduct.

¶ 33                                    Board's Decision

¶ 34 Apostolov next contends we should uphold the Board's decision to reinstate him to the eligibility list as it was not against the manifest weight of the evidence. In response, the Superintendent argues the Board had no discretion to reinstate Apostolov under special order 14-01, and the Board cannot "convert a mandatory disqualification factor into a discretionary one, or alter the CPD's standards of employment." The Superintendent essentially argues that the Board may not supplant his objective decision because he, not the Board, is charged with administering the CPD rules for hiring police officers.

¶ 35    The clearly erroneous standard applies, as we have stated, and we reverse only where we are left with the "definite and firm conviction that a mistake has been committed." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill.2d 380, 393 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 36    As noted, section IV(B) of special order 14-01 mandates disqualification for criminal conduct regardless of when it occurred, aside from a few enumerated exceptions listed in section IV(B)(2)(b), including minimal illegal drug use in the distant past, marijuana use in the recent past, and a single misdemeanor committed more than three years before the application. Moreover, section IV(B)(1) states firmly that "[a]n applicant who has engaged in any conduct which constitutes a felony is not eligible for employment."

¶ 37    At oral argument, Apostolov's attorney conceded that theft is a felony (see 720 ILCS 5/16-1 *et seq.* (West 2016)) and that Apostolov pleaded guilty to both theft and burglary in 1996. But, she argued that the Board has discretion to overturn the Superintendent's application of mandatory hiring standards if warranted by a particular applicant's circumstances. She could cite no cases or rules bestowing that authority on the Board, and our research similarly failed to uncover any. So, we reject Apostolov's assertion that the Board may overturn the Superintendent's decision to reject an applicant who has engaged in mandatorily disqualifying criminal conduct.

¶ 38    We also reject Apostolov's contention that absent the power to overturn the Superintendent's decision, the appeal process serves no purpose. The Board has authority to overturn disqualification where the Superintendent made a factual error and, for instance, disqualified an applicant for conduct that did not constitute a felony or conduct that comes under

one of the section IV(B)(2)(b) exceptions. But, the Board does not have authority to overturn the Superintendent's decision to disqualify an applicant whose conduct is mandatorily disqualifying.

¶ 39    The Board acknowledged the Superintendent proved by a preponderance of the evidence that Apostolov engaged in disqualifying criminal conduct when he pleaded guilty to theft and burglary. Under the mandatory language of special order 14-01 that should have been the end of the inquiry. The Board's decision to reinstate Apostolov was clearly erroneous, and the trial court properly reversed the Board. As a result, we affirm the trial court's order.

¶ 40    Affirmed.