Filed 7/29/08          NO. 4-07-0645

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE STATE OF ILLINOIS, DEPARTMENT OF CENTRAL MANAGEMENT SERVICES (ILLINOIS DEPARTMENT OF CORRECTIONS), Petitioners-Appellants, v. THE STATE OF ILLINOIS, ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; JACKIE GALLAGHER, MICHAEL HADE, CHARLES HERNANDEZ, REX PIPER, and MICHAEL COLI, the Members of the Said Board and Panel in Their Official Capacity Only; JOHN BROSNAN, Executive Director of Said Board in His Official Capacity Only; and THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, Respondents-Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Direct Appeal from Illinois Labor Relations Board No. S-CA-05-004 |

_____

JUSTICE COOK delivered the opinion of the court:

The State of Illinois, Department of Central Management Services (hereinafter CMS) and Department of Corrections (hereinafter DOC), appeals a decision of the Illinois Labor Relations Board, State Panel (ILRB), which found that DOC violated the Illinois Public Labor Relations Act (5 ILCS 315/10(a)(1), (a)(4) (West 2004)).  American Federation of State, County & Municipal Employees, Council 31 v. Illinois Departments of Central Management Services & Corrections, 23 Pub. Employee Rep. (Ill.) par. 113, at 475, No. S-CA-05-004 (Illinois Labor Relations Board, State Panel, June 29, 2007) (hereinafter 23 Pub. Employee Rep. (Ill.) par. 113).  The ILRB found that DOC had implemented layoffs within the prison system without first bargaining in good faith with the employee's representative, the American Federation

of State, County, and Municipal Employees, Council 31 (AFSCME). The master contract between the parties gave the State the right to decide, determine upon and implement layoffs, but AFSCME argued that the State still had the duty to bargain over the effects or impact of such a layoff and breached that duty. We reverse.

## I. BACKGROUND

Governor Rod Blagojevich, in his February 18, 2004, budget proposal, called for an elimination of positions in DOC, to take effect in the next fiscal year, beginning July 1, 2004. One group of layoffs arose from the prospective closures of the Vandalia Correctional Center and the St. Charles Youth Center. The other group, at issue in this case, was scattered among various DOC facilities. The focus of those layoffs was to standardize staffing and eliminate unnecessary positions. The day after the budget proposal, AFSCME's regional director asked DOC to "identify each incumbent [by name] who would be affected by this proposal." About April 1, preliminary plans for the elimination of positions and consequent reorganization became finalized and attention turned to seniority, bumping, and layoff provisions. CMS completed its review and approved the layoff and identification of persons to be subject to layoff and bumping by mid-April 2004. On April 27, 2004, DOC released to AFSCME a list of facilities, job classifications, and the number of employees subject to layoff. On April 30, 2004, DOC distributed individual layoff packets to all employees who would be affected by the June

30, 2004, reorganization.

In the latter part of May 2004, DOC sent teams of personnel staff to the various facilities to accomplish the 24- to 48-hour notice to individual employees required by the master contract. The teams were to meet individually with employees whose positions were to be eliminated, beginning with the most senior employee. The team informed the employee about his or her seniority and bumping rights, described the layoff-bumping process, showed him or her the seniority list, and obtained the employee's decision whether he or she wanted to waive bumping and be considered only for transfers to vacancies. Typically, the facility warden was present at these meetings, together with the president of the union local, and one or more AFSCME representatives.

DOC and AFSCME representatives meet every two or three months as a standing committee to discuss labor-management issues generally and often to bargain over the effects of DOC decisions. A standing committee meeting was held on April 12 and 13. The first bargaining meeting was held June 2. According to the administrative law judge (ALJ), "it is clear that the plan was not, as yet, complete or near implementation as to some positions." American Federation of State, County & Municipal Employees, Council 31 v. Illinois Departments of Central Management Services & Corrections, 23 Pub. Employee Rep. (Ill.) par. 113, at 484, No. S-CA-05-004 (Illinois Labor Relations Board, State Panel, Administrative Law Judge's Recommended Decision and Order,

June 29, 2007) (hereinafter ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113). The second bargaining meeting was held June 30, 2004, the date the reorganization was to become effective. At the meeting, DOC agreed that if Vandalia did not close, the 400 vacancies reserved for Vandalia employees would be offered to those in the reorganization layoff. That same day, DOC laid off 66 bargaining-unit members, eliminating their positions, which in turn affected 100 other bargaining-unit members through bumping, transfers, and lateral assignments. The third meeting was held July 22. On August 2, 2004, AFSCME filed the instant unfair-labor-practice charge.

The ALJ concluded that once it was known which employees were to be laid off or affected by layoff, which was known after the May meetings with the individual employees to be affected, DOC should have furnished AFSCME with a list. The ALJ concluded that the failure to furnish a list constituted at least a technical failure to bargain in good faith. The ALJ recommended that DOC be ordered to provide AFSCME with the list of all employees who were laid off or affected by the June 30, 2004, layoff. Although DOC argued that the information requested was known to AFSCME, and AFSCME could have easily compiled its own list, the ALJ concluded that "to have a list compiled by the State would have avoided all or any confusion about what the State intended to do--no compilation by various AFSCME representatives in meetings across the State in various locations would have that authoritative touch." ALJ recommended decision, 23

Pub. Employee Rep. (Ill.) par. 113, at 486.

On the major issue in the case, however, the ALJ ruled in favor of DOC:

> "I find that AFSCME sought to bargain
> not effects or impact of the decision to
> layoff but instead the very decision to
> layoff itself.  That decision is strengthened
> by Maupin's [AFSCME's Regional Director for
> southern Illinois'] testimony that, had he
> the list he had requested of names, he would
> have attempted to propose changes in wages
> to stave off some of the layoffs and otherwise
> bargained about the individuals to be laid
> off or affected by layoff."  ALJ recommended
> decision, 23 Pub. Employee Rep. (Ill.) par.
> 113, at 487.

Some of AFSME's objections went to performance of work by employees outside the bargaining unit or violations of the complicated pay and classification scheme, but the ALJ concluded those issues were already addressed by the master contract.  A grievance could be filed on those issues but there was no obligation on the part of either party to bargain further about that subject.

The ALJ rejected the claim that DOC "engaged in delay tactics."  ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113, at 487.  DOC could not be expected to engage in "impact bargaining" until it had determined who was to be laid off,

moved, or bumped. "I find no indication on this record that any 'delay' occurred such that would indicate an unwillingness to meet at reasonable times and places to reach agreement." ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113, at 487. The ALJ also rejected the contention that DOC failed to send representatives to the table with sufficient bargaining authority:

> "As the record makes clear, AFSCME presented proposals that did not have to do with the effect or impact of the decision to layoff but instead substantially with the decision to layoff, person by person. That is what AFSCME tacitly admits in its phraseology, 'identifying problems.' Hence [DOC] was under no duty to bargain as to such matters at all, as the labor agreement already meant the parties had fully bargained about the decision to layoff and that bargain was that the State could make that decision at any time. Moreover, to the extent that the proposals involved objections to the planned layoff on various contractual grounds, the grievance procedure was itself the agreed-upon procedure to raise such matters and that procedure did not require same-day responses." ALJ recommended decision, 23 Pub. Employee

Rep. (Ill.) par. 113, at 487.
The ALJ found no evidence to support the allegation that DOC engaged in "direct dealing" with employees or was lying when it decided to postpone the closing of the Vandalia facility "indefinitely." ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113, at 488.

The ALJ noted that although typically an employer must await consent or impasse as to the effects of impasse bargaining before instituting a decision, the parties here had negotiated an agreement that gave the State the right to decide, determine upon, and implement a layoff. The master contract was to expire on June 30, 2004. To allow AFSCME to delay a layoff decision by raising proposals over which DOC had no obligation to bargain "would result in AFSCME overturning the bargain it had made and stuck to through several labor agreements." ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113, at 488.

On June 29, 2007, in a brief order, the ILRB rejected the ALJ's recommended decision and ordered DOC to (1) "rescind the June 30, 2004[,] layoff until such time as [r]espondent State has bargained in good faith with AFSCME, to either impasse or agreement, over the impact thereof"; (2) reinstate the employees laid off, bumped, or moved; and (3) make whole the employees for the loss of any pay or benefits. The ILRB recognized that some of AFSCME's proposals improperly sought to bargain the decision to layoff, but "others were aimed at effects, such as the proposals regarding the redistribution and transfer of work." 23 Pub.

Employee Rep. (Ill.) par. 113, at 477.  Because "the State's layoff plan was far from settled, [it was] difficult, if not impossible for AFSCME to advance its proposals on effects."  23 Pub. Employee Rep. (Ill.) par. 113, at 477.  According to the ILRB, the imminent expiration of the collective-bargaining agreement was not a factor to be considered: "the State's relatively hurried implementation of the layoff is not a sufficient basis to deprive AFSCME of an adequate opportunity to bargain the effects thereof."  23 Pub. Employee Rep. (Ill.) par. 113, at 477.

Chairman Gallagher and Member Piper, dissenting, noted that the task of determining who is laid off, after taking into account seniority, bumping rights, and moves to vacant positions, is inherently complicated and time-consuming.  All of AFSCME's proposals improperly went to the decision to layoff as to particular employees.  There was no obligation to bargain regarding the transfer of work to employees outside the unit as the master contract already prohibited such action.  If AFSCME had really wanted to formulate and present general issues and proposals regarding the effects of a layoff, it could have done so, even though the State's plan was not complete by the June 2 meeting.  23 Pub. Employee Rep. (Ill.) par. 113, at 478 (Gallagher, Chairman, and Piper, Member, dissenting).

## II. ANALYSIS

We review <u>de</u> <u>novo</u> the ILRB's decision with respect to questions of law.  <u>AFM Messenger Service, Inc. v. Department of Employment Security</u>, 198 Ill. 2d 380, 390, 763 N.E.2d 272, 279

(2001). However, we give substantial weight and deference to the ILRB's interpretation of the law, because an agency is able to make informed judgments upon the issue, based upon its experience and expertise. Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n, 95 Ill. 2d 142, 153, 447 N.E.2d 295, 300 (1983). We review mixed questions of law and fact under the clearly erroneous standard, and we will set aside the ILRB's determination of fact only if it is against the manifest weight of the evidence. AFM Messenger Service, 198 Ill. 2d at 392, 763 N.E.2d at 280. In order for a finding to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. Chicago Park District v. Illinois Labor Relations Board, Local Panel, 354 Ill. App. 3d 595, 608, 820 N.E.2d 61, 73 (2004). Although the ILRB is free to accept or reject the ALJ's findings and recommendations, the ILRB's order must have some support in the record. Sherman v. Human Rights Comm'n, 206 Ill. App. 3d 374, 386, 564 N.E.2d 203, 212 (1990).

The decision to lay off employees for economic reasons is generally considered a mandatory subject of bargaining about which both parties have a duty to bargain. In the present case, however, AFSCME had previously waived its statutory right to bargain over the decision to layoff employees. American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board, 274 Ill. App. 3d 327, 653 N.E.2d 1357 (1995). AFSCME argues, however, that DOC still has the duty to bargain over the effects or impact of such a layoff. The ILRB

concluded that "[a]lthough some of AFSCME's proposals indeed sought to bargain the decision [to lay off], others were aimed at effects, such as the proposals regarding the redistribution and transfer of work." 23 Pub. Employee Rep. (Ill.) par. 113, at 477. We disagree. AFSCME had made a proposal, or objection, to the performance of work by employees outside the bargaining unit, but such transfer of work was already prohibited by reason of the master contract and neither party had any obligation to bargain about that subject further. Other objections went to whether some classifications within the bargaining unit could properly perform an eliminated position's tasks, but again, that question was already covered by the master contract's complicated pay and classification scheme. The ILRB does not identify any proposal made by AFSCME which was "aimed at effects."

What really are proposals regarding "effects" or "impact" of a layoff? The ALJ gave several examples: additional training, mental or emotional therapy, job-referral services and moving expenses, severance pay, extension of benefits. The ALJ also concluded that AFSCME made no such proposals and gave no indication that it intended to make such proposals, finding that AFSCME sought not to bargain effects or impact of the decision to layoff but instead the very decision to lay off itself. ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113, at 487. The ILRB disagreed with the ALJ, but did not give any explanation what proposals regarding "effects" or "impact" were considered by AFSCME or ignored by DOC. 23 Pub. Employee Rep.

(Ill.) par. 113, at 477.  If an agency rejects the fact finding of an ALJ, the agency, at a minimum, should provide the appellate court with a rational exposition of how other facts or circumstances justify such a course of action.  Dantran, Inc. v. United States Department of Labor, 171 F.3d 58, 73 (1st Cir. 1999).  It is not enough for the agency to merely state that it disagrees with the ALJ; the agency should set forth the basis of its disagreement so that it may be determined whether the agency's finding is supported by substantial evidence in the record.  International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 310 v. National Labor Relations Board, 587 F.2d 1176, 1181 (D.C. Cir. 1978).

The ILRB concluded that "the State's plan was in disarray and that the parties had no opportunity to rationally discuss the impact of the decision."  23 Pub. Employee Rep. (Ill.) par. 113, at 477.  The ALJ found, however, that DOC did not engage in "delay tactics" and that DOC was willing at all times to meet at reasonable times and places to reach agreement.  ALJ recommended decision, 23 Pub. Employee Rep. (Ill.) par. 113, at 487.  The ILRB again points to no facts inconsistent with that position.  State layoffs for economic reasons routinely follow a pattern.  Traditionally, the Governor announces a proposed budget in February that will become effective the following July 1.  June 30 of each year is the last day of the State's fiscal or budget year.  AFSCME was aware of these dates when it agreed to the master contract, which gives the State the right to decide upon and implement a layoff plan.  Everyone recognizes that

accomplishing a layoff under the master contract is complicated, requiring a comparison of job classifications, determinations whether vacancies exist, and individual determinations whether there is a right to bump other employees and whether that right will be exercised.  If AFSCME really wanted to bargain over the impact and effects of the layoff, it could have done so after the layoff occurred.  One such meeting was held, on July 22, but AFSCME chose to file the instant unfair-labor-practice charge 11 days later, on August 2.

The master contract addressed layoff issues in detail in article XX and contains mechanisms for resolving them.  One mechanism was the 30-day notice, requiring that AFSCME be given a notice 30 days in advance of the layoff, if possible, which shall "contain the details of layoff with respect to numbers, position classification, and work location."  There is no dispute that notice was given on April 27.  Another mechanism calls for individual meetings between management and the employees to be laid off, bumped, or transferred, to ascertain what the employee wants to do, after giving him 24 to 48 hours earlier the seniority lists and vacancy lists to review and explaining options.  It is only after the conclusion of those meetings that DOC can identify who is subject to lay off or affected by it.  The State was not acting in disarray when it followed the mechanisms set out in the master contract.  The fact that the master contract deals with a complicated situation to be resolved within a limited period of time does not automatically result in a failure

- 12 -

to bargain in good faith.

### III. CONCLUSION

For the foregoing reasons, we reverse the ILRB's decision.

Reversed.

TURNER and STEIGMANN, JJ., concur.