2021 IL App (1st) 192209

SIXTH DIVISION
December 3, 2021

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-2209

| | | |
|---|---|---|
| POLICEMEN'S BENEVOLENT LABOR COMMITTEE, | ) ) ) | |
| Petitioner, | ) ) | Petition for Review of a Decision and Order of the |
| v. | ) ) | Illinois Labor Relations Board, Local Panel. |
| THE ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL, THE COUNTY OF COOK, and THE SHERIFF OF COOK COUNTY | ) ) ) | No.1-CA-18-037 |
| Respondents. | ) ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    This is a direct appeal from a final administrative decision of the Illinois Labor Relations Board, Local Panel (Board), dismissing an unfair labor practices charge brought by the Policemen's Benevolent Labor Committee (Union), against Cook County (County) and the Sheriff of Cook County (Sheriff). The Board found that the County and Sheriff, as joint employers, did not commit unfair labor practices when they laid off 16 lieutenants in the Sheriff's Court Services Department while the parties were still in the midst of impact bargaining. The Union now appeals. For the reasons that follow, we affirm the Board's decision.

¶ 2                              I. BACKGROUND

¶ 3     The Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 2016)) regulates "labor relations between public employers and employees, including the designation of employee representatives, negotiation of wages, hours and other conditions of employment, and resolution of disputes arising under collective bargaining agreements." *Id.* § 2. The general purpose of the statute is "to prescribe the legitimate rights of both public employees and public employers, to protect the public health and safety of the citizens of Illinois, and to provide peaceful and orderly procedures for protection of the rights of all." *Id.*

¶ 4     The Sheriff and the County (Employers) are public employers as defined by the Act. The Union, a labor organization as defined by the Act, serves as the exclusive bargaining representative for lieutenants employed in the Cook County Sheriff's Court Services Department.

¶ 5     The following facts are based upon the pleadings and testimony heard at an October 22, 2018, hearing before an administrative law judge (ALJ) for the Board.

¶ 6                              A. The Layoffs

¶ 7     In the summer of 2017, the Cook County Board of Commissioners voted to repeal the beleaguered "Soda Tax," leading to an unplanned shortfall in revenue. In response, the County began a series of layoffs in its public workforce.

¶ 8     As part of this, and following a directive from the County, on November 28, 2017, Mr. Thomas Nelligan, assistant general counsel for the Sheriff, sent an e-mail to Union officials explaining that, due to the deficit in the County's operating budget, plans were in motion to lay off lieutenants in the Court Services Department. The following day, the human resources office at the Sheriff's Department sent e-mails to the 16 affected lieutenants, informing them that their jobs would be eliminated effective two weeks later, on December 13, 2017. Providing the lieutenants

with two weeks' notice satisfied a provision of the governing collective bargaining agreement (CBA) between the Employers and the Union that granted the Employers the authority to pursue layoffs when deemed necessary "due to lack of funds or lack of work." The Union acknowledges that the Employers provided appropriate notice of the layoffs.

¶ 9 On November 30, an attorney for the Union, Mr. Joseph Andruzzi, sent an e-mail to Mr. Nelligan with the subject line: "Demand for Bargaining." In the e-mail, Mr. Andruzzi explained:

"[U]nder Section 7 of the Illinois Public Labor Relations Act, unilateral changes cannot be implemented regarding mandatory subjects of bargaining until the completion of bargaining. The effects of the layoffs were never negotiated. The Union is prepared to commence bargaining over the effects of these layoffs immediately. Until bargaining is complete, any impending layoffs should be halted."

The Employers notified the Union that they agreed to the demand for bargaining, and representatives of the Sheriff's Department met on three separate occasions with Union officials to discuss the impending layoffs. These meetings took place on December 8, 2017, December 28, 2017, and January 9, 2018.

¶ 10 B. The Meetings

¶ 11 At the first meeting, the Employers advised the Union that at the Union's request for more time, it was going to push back the effective date of the layoffs from December 13, 2017, to January 5, 2018. The Union presented a revenue-raising proposal intended to address the deficit and offset the need for the layoffs. The proposal consisted of unilaterally raising civil processing fees. Mr. Nelligan said he would "look into" the Union's proposal but expressed doubt that such fees could be easily raised, as it was his understanding that they were set by statute.

¶ 12 Following the meeting, on December 14, 2017, Mr. Thomas Pleines, an attorney for the

Union, sent an e-mail to Mr. Nelligan informing him that the Union would be filing a grievance and demanding arbitration over the Employers' alleged failure to bargain the impact of the layoffs. Mr. Pleines explained that the Union did not consider the December 8 meeting to have been a valid bargaining session. The grievance was filed the following day, on December 15, 2017, by the president of the Union, Lieutenant Susan Joyce, who had attended the first meeting. On the official grievance form, she reported:

> "On December 08, 2017, members of the PBLC met with the employer to bargain over the impact of Lieutenant layoffs. The Union submitted 2 proposals to raise revenues in an amount sufficient to cure the reported budgetary shortfall. The Employer disagrees. A layoff date was scheduled for 05Jan18. Since that initial meeting, no other bargaining meetings have been scheduled. Under section 18.9 of the Lieutenants contract, the Union has the right to arbitrate any dispute over changes in economic benefits."

The Employers did not officially respond to the grievance, causing it to be automatically advanced to the second phase of the four-step grievance process delineated in article V of the CBA.

¶ 13     Three days later, on December 18, 2017, Mr. Nelligan responded to Mr. Pleines's December 14 e-mail, inquiring about dates for the parties to "meet again to discuss the impact." Mr. Pleines suggested December 28, which Mr. Nelligan agreed to.

¶ 14     At the second meeting, on December 28, the Union once again took the opportunity to present a revenue-raising proposal, claiming that its members could bring in additional funds by facilitating active-shooter training sessions for other law enforcement departments. Mr. Nelligan expressed skepticism at the plan, worrying about its feasibility and liability issues.

¶ 15     The Union also raised questions about how the layoffs would affect seniority, "bumping rights," recall rights, and other miscellaneous matters. At the end of this second meeting, Mr.

Nelligan said he needed to do more research on these topics and the parties agreed to meet again on January 9, 2018, to continue their conversation. Mr. Nelligan also testified that he broached the subject of salary reductions to alleviate the need for some of the layoffs but that the Union ignored the comment.

¶ 16 Between meetings, and away from the bargaining table, the parties exchanged follow-up e-mails concerning some of the topics they had discussed. The Employers sought to verify with the Union that their information on seniority was up-to-date, and the Union provided corrections to their lists. The feedback was incorporated. The Union also notified the Employers that all the lieutenants identified for layoff would be exercising their bumping rights save for two, who would be retiring instead.

¶ 17 A "bumping right" is a contractual right to replace a lower ranking or less senior employee in the event of a layoff. Here, as the Board explains in its brief, the CBA expressly granted lieutenants bumping rights, stipulating that in the event of a layoff, "the lieutenants could choose to accept a demotion to sergeant rather than be laid off, thereby displacing sergeants with less seniority."

¶ 18 On January 3, 2018, two days before the layoffs would take effect (and six days before the parties were scheduled to meet again to continue discussing the effects of the layoffs), the Union filed a charge of unfair labor practices with the Board, alleging that the Sheriff and County had failed to bargain in good faith at the prior two meetings. In the accompanying memo, the Union alleged:

> "[i]t was clear by the actions taken by the Employer at both the first and second meetings it never intended to bargain in good faith over the impact of the elimination of the positions and subsequent layoffs. Instead it only engaged in surface bargaining. The employer

representatives made no proposals or counterproposals, had no decision-making authority, and had no intention to ever negotiate their unilateral decision to eliminate positions and implement layoffs without first negotiating the impacts of these actions with the Union."

¶ 19    On January 9, four days after the layoffs were implemented, the parties met as planned for the third time for what would be their final meeting. At the meeting, Mr. Kramer, hoping to arrive at a "good resolution to this," proposed extending the recall rights for all the laid off lieutenants. The Union declined the offer, later explaining that they were wary of any proposals not reduced to writing. The Union did not make any additional proposals or counterproposals at this meeting. After the meeting, the Union allowed their grievance to expire without advancing it to the next stage, choosing to focus their efforts on their unfair labor practices charge instead. No more meetings were scheduled.

¶ 20                    C. The Administrative Hearing

¶ 21    On October 22, 2018, a hearing was held before the ALJ to adjudicate the Union's unfair labor practices charge. Representatives from both sides of the dispute provided testimony. Lieutenant Donald Milazzo, the Union's vice president, testified for the Union. Mr. Nelligan and Mr. Kramer testified for the Employers.

¶ 22     In her recommended decision and order (RDO) issued on March 29, 2019, the ALJ found that the Employers had violated subsections (a)(1) and (a)(4) of section 10 of the Act. *Id.* § 10(a)(1), (4). Even though she concluded that the Union, through its revenue-raising proposals, had sought to bargain the layoff decision itself, the ALJ found that the Union raised other issues that were legitimate subjects for "effects" bargaining. The ALJ based her finding of unfair labor practices on the fact that the layoffs were implemented while the parties still had a scheduled third meeting on the calendar to continue discussing impact. The ALJ concluded that "even absent other

indicia of bad faith bargaining," the fact that the Employers had implemented the layoffs *before* concluding bargaining over the effects constituted an unfair labor practice. The ALJ reasoned that "regardless of whether the Respondents engaged in good faith bargaining at the two meetings on December 8th and 28th, the Parties had not concluded bargaining over the effects of the layoffs when Respondents implemented the layoffs on January 5, 2018." The ALJ ruled that the Employers' "implementation of the layoff without first bargaining over its effects [was] an unfair labor practice even absent other indicia of bad faith bargaining." *American Federation of State, County & Municipal Employees, Council 31*, 23 PERI ¶ 113 (ILRB State Panel 2007).

¶ 23    Pursuant to section 1200.135 of Title 80 of the Illinois Administrative Code, the Sheriff timely filed exceptions to the ALJ's RDO, along with a detailed brief contesting the ALJ's conclusions. 80 Ill. Adm. Code 1200.135 (2016). The Union countered with a response to the Sheriff's exceptions, arguing that the ALJ's findings were proper and urging the Board to adopt the RDO in its entirety on review. The case then advanced to the Board.

¶ 24                          D. The Board's Decision

¶ 25    On October 9, 2019, the Board issued a decision accepting the ALJ's findings of fact but rejecting her legal analysis and her ultimate conclusion that the Act had been violated. The Board specifically disagreed with the ALJ's ruling that the Employers had committed an unfair labor practice because they implemented the layoffs *before* concluding bargaining over the effects of the layoffs, noting that in making that ruling, the ALJ had cited a previous Board decision (see *American Federation of State, County & Municipal Employees, Council 31*, 23 PERI ¶ 113 (ILRB State Panel 2007)) that had been reversed by this court in *State of Illinois v. State of Illinois, Illinois Labor Relations Board, State Panel*, 384 Ill. App. 3d 342 (2008) (*CMS v. ILRB*). The Board found that under the specific provisions of this CBA, the "[employers] were not obligated to bargain, to

agreement or impasse, the effects of the layoff in this case because the parties had already bargained, or the Labor Committee waived bargaining, the very 'effects' of the layoff that the ALJ found the Labor Committee wished to bargain."

¶ 26    The Board also held that *even if* the Employers were required to bargain over the effects of certain discrete issues identified by the ALJ, there was "no evidence in the record, or reasons given, as to why these matters could not be negotiated after the effective date of the layoff." Based on these two rationales, the Board dismissed the Union's unfair labor practices charge.

¶ 27                              E. Subsequent Procedural History

¶ 28    The Board entered its final order dismissing the Union's complaint for a hearing in its entirety on October 9, 2019. The Union timely filed for direct appellate review of the Board's final decision on October 29, 2019, within the 35-day window set forth in section 3-113(b) of the Administrative Review Law (735 ILCS 5/3-113(b) (West 2018)). However, it failed to name the Board as a respondent, a requirement under both the Administrative Review Law and Illinois Supreme Court Rule 335 (eff. Feb. 1, 1994).

¶ 29    The Union then sought permission to amend its petition for review so that it could properly name the Board, which this court granted on November 26, 2019. In our order we gave the Union an additional 35 days to correct its filing and properly name all necessary parties in this matter. The Union did not take any action to correct its filing, and the period for amending the petition lapsed on December 31, 2019.

¶ 30    On January 16, 2020, the Board filed a motion to dismiss the appeal, arguing that "the petitioner's failure to file and serve an amended petition for review naming all additional and necessary respondents," after having been granted an extension, was a "fatal defect that should result in dismissal of the action for direct administrative review." On January 22, 2020, this court

directed the Union to respond to the Board's motion by February 7, 2020. No response was filed, and on February 20, 2020, this court dismissed the appeal.

¶ 31     Five days later, the Union filed a motion to vacate the dismissal order, arguing that absent some showing of prejudice to the opposing party, its repeated failures to file and serve an amended petition did not deprive this court of jurisdiction. The attorney for the Union, Mr. Andruzzi, also submitted an accompanying affidavit in which he claimed that he had not received this court's orders or the Board's motion to dismiss. This court denied both the Union's motion to vacate and a subsequent petition for rehearing.

¶ 32     The Union then filed a petition for leave to appeal to the Illinois Supreme Court, which declined to hear the appeal but issued a supervisory order directing this court to vacate our February 20, 2020, dismissal order and consider the Union's appeal on the merits. *Policemen's Benevolent Labor Committee v. County of Cook*, No. 126033 (Ill. Sep. 30, 2020) (supervisory order). The Union's petition for direct review is properly before us pursuant to this supervisory order.

¶ 33                                    II. JURISDICTION

¶ 34     We have jurisdiction over this matter pursuant to section 11(e) of the Act (5 ILCS 315/11(e) (West 2020)), section 3-113 of the Code of Civil Procedure (735 ILCS 5/3-113 (West 2020)), and Rule 335 (Ill. S. Ct. R. 335 (eff. Feb. 1, 1994)).

¶ 35                                    III. ANALYSIS

¶ 36                                    A. Standard of Review

¶ 37     In reviewing decisions made by the Board, we are governed by the Administrative Review Law (735 ILCS 5/art. III (West 2020)) and section 11 of the Act (5 ILCS 315/11 (West 2020)). As our supreme court has explained, "[t]he applicable standard of review depends upon whether the

question presented is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005). An administrative agency's findings on questions of fact are "deemed to be *prima facie* true and correct" and thus, a reviewing court's task is limited to "ascertain[ing] whether the findings and decision of the agency are against the manifest weight of the evidence." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Administrative decisions based on questions of law are reviewed *de novo*. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Finally, decisions based on mixed questions of fact and law are subject to reversal only when deemed clearly erroneous. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 38    "Mixed questions of fact and law are 'questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' " *American Federation of State, County & Municipal Employees, Council 31*, 216 Ill. 2d at 577 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)). As the central dispute in this case concerns whether the Board was correct in its determination that the established facts did not constitute an unfair labor practice under the Act, this case presents mixed questions of fact and law. The Board's decision is thus only subject to reversal if we find it to be clearly erroneous. *City of Belvidere*, 181 Ill. 2d at 205; *City of Loves Park v. Illinois Labor Relations Board State Panel*, 343 Ill. App. 3d 389, 393 (2003).

¶ 39    This is a demanding standard that grants significant deference to the experience and expertise of the agency. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 395. We *must* accept the

agency's findings "unless we come to the definite and firm conviction that a mistake has been committed." *Illinois Beta House Fund Corp. v. Department of Revenue*, 382 Ill. App. 3d 426, 429 (2008). Moreover, we may affirm the agency's decision on any basis that is supported by the record. *Id.*

¶ 40                     B. The Board Did Not Clearly Err in This Case

¶ 41              1. The Employers Had No Obligation to Bargain Over the Layoffs

¶ 42    Section 10 of the Act provides, in pertinent part:

>  "(a) It shall be an unfair labor practice for an employer or its agents:

>   (1) to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization or contribute financial or other support to it ***;

> \* \* \*

>   (4) to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit ***[.]" 5 ILCS 315/10(a)(1), (4) (West 2016).

As a general matter, a public employer violates its obligation to bargain in good faith under subsections (a)(1) and (a)(4) of section 10 "when it makes a unilateral change in a mandatory subject of bargaining without granting notice and an opportunity to bargain with its employees' exclusive bargaining representative." *Amalgamated Transit Union, Local 241 v. Illinois Labor Relations Board*, *Local Panel*, 2017 IL App (1st) 160999, ¶ 35. The decision to pursue layoffs for economic reasons can be "considered a mandatory subject of bargaining." *CMS v. ILRB*, 384 Ill. App. 3d at 347. Here, however, when it negotiated the CBA, the Union gave up any right to bargain

over the Employers' decision to pursue specific layoffs during the term of the agreement.

¶ 43     Section 8.5(a) of the CBA, titled "Reduction in Work Force, Layoff, Recall and Bumping," addresses the parties' respective rights in relation to layoffs, providing, in pertinent part:

> "Should the Employer determine that it is necessary to decrease the number of employees within the job classification of the bargaining unit, due to lack of funds or lack of work, the employees to be laid off in that classification shall be removed in inverse order of seniority (*e.g.* last promoted, first laid off). Affected employees and the Labor Committee shall be given notice thereof at least two (2) weeks prior to the effective date of such layoff. Employees laid off as a result of this procedure shall be subject to recall in order of seniority, before any new employees are hired or promoted into the job classification held by them at the time of the reduction in force."

This provision expressly delegated the unilateral authority to implement layoffs to the Employers. The Union acknowledges this grant of authority, noting that "the decision to impose layoffs is a matter of managerial prerogative and is therefore not a mandatory subject of bargaining."

¶ 44     However, the Union still possessed the right to bargain over the *impact* of that decision under section 4 of the Act, which recognizes that while "[e]mployers shall not be required to bargain over matters of inherent managerial policy" they shall be required to "bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives." 5 ILCS 315/4 (West 2016).

¶ 45     The dispute between the parties in this case centers on the scope and timing of this impact or effects bargaining. Here, we find no clear error by the Board in its conclusion that the Employers did not commit any unfair labor practices during the parties' impact bargaining meetings or in

implementing the layoffs before the third scheduled meeting occurred.

¶ 46        2. The Union Sought to Bargain the Layoff Decision Itself, Not Impact

¶ 47    The obligation to engage in impact bargaining is not without its limits. Importantly, "[n]ot every impact of a managerial prerogative decision requires bargaining." *American Federation of State, County & Municipal Employees, Council 31*, 31 PERI ¶ 114 (ILRB State Panel 2014). Instead, an employer "must bargain only where the effects are not an inevitable consequence of the decision itself." *Id.* This "ensure[s] that impact bargaining does not inevitably lead to questioning of the underlying decision." *Policemen's Benevolent & Protective Ass'n, Unit #5*, 36 PERI ¶ 113 (ILRB State Panel 2020).

¶ 48    In her RDO, the ALJ determined that the Employers' "implementation of the layoff without first bargaining over its effects [was] an unfair labor practice even absent other indicia of bad faith bargaining." In making this assertion, the ALJ erroneously relied on a prior Board decision, *American Federation of State, County & Municipal Employees, Council 31*, 23 PERI ¶ 113 (ILRB State Panel 2007). As the Board and Sheriff both note, we reversed that decision in *CMS v. ILRB*, 384 Ill. App. 3d 342. *CMS v. ILRB* has significant similarities to this case and guides us here on the scope and timing of impact bargaining.

¶ 49    The dispute in *CMS v. ILRB* began when then-Governor Rod Blagojevich called for the elimination of a number of positions in the Illinois Department of Corrections (IDOC) as part of a budgetary reform initiative. *Id.* at 343. In the weeks and months following the announced proposal, IDOC authorities met with AFSCME, the union representing the IDOC workers affected by the proposal, on three separate occasions to discuss the layoffs: twice before implementation and once afterwards. *Id.* at 344. After the third meeting, AFSCME walked away from the bargaining table and filed an unfair labor practices charge with the State Panel of the Board, alleging IDOC failed

to bargain in good faith over the effects of the layoffs. *Id.* at 344-45.

¶ 50    The ALJ in *CMS v. ILRB* sided with IDOC, explaining that the union "sought to bargain not effects or impact of the decision to layoff but instead the very decision to layoff itself." (Internal quotation marks omitted.) *Id.* at 345. According to the ALJ, under the "master contract" between the parties, IDOC had no obligation to consider proposals targeting the layoff decision. *Id.* Further, permitting the union to delay the layoff date with these proposals "would result in [the union] overturning the bargain it had made and stuck to through several *** agreements." (Internal quotation marks omitted.) *Id.* at 346.

¶ 51    The Board rejected the ALJ's recommendation, finding that while some of the union's proposals indeed improperly sought to bargain the layoff decision itself, "others were aimed at effects, such as the proposals regarding the redistribution and transfer of work" and that "the State's layoff plan was far from settled" at the time of implementation. (Internal quotation marks omitted.) *Id.*

¶ 52    Reversing the Board's decision on direct review, we agreed with the ALJ that, for the most part, the Union "sought not to bargain effects or impact of the decision to lay off but instead the very decision to lay off itself." *Id.* at 348. We noted that none of the Union's proposals were really aimed at the effects of the layoffs but instead at the layoffs themselves. *Id.* We emphasized that the Union could not attempt to bargain for something that was prohibited by the CBA. *Id.*

¶ 53    We also rejected the idea that impact bargaining had to draw to a close before IDOC could implement its planned layoffs. *Id.* at 348-49. "If [the union] really wanted to bargain over the impact and effects of the layoff," we explained, "it could have done so after the layoff occurred." *Id.* at 349. We concluded that IDOC had satisfied its obligations under its master contract and the Act and "[t]he fact that the master contract [dealt] with a complicated situation to be resolved

within a limited period of time [did] not automatically result in a failure to bargain in good faith."

*Id.*

¶ 54    Here, the Union makes no effort to reconcile our holding in *CMS v. ILRB* with its desired outcome. The case is not mentioned in the Union's opening brief, although the Board explicitly relied on *CMS v. ILRB* in its order. The appellees also cite this decision, and the Union did not file a reply brief, despite being given an extension of time to do so. The Union's failure to grapple with this precedent undermines its effort to move this court toward a "definite and firm conviction" that the Board has erred in this case. See *Illinois Beta House Fund Corp.* 382 Ill. App. 3d at 429.

¶ 55    In this case, as in *CMS v. ILRB* (see 384 Ill. App. 3d at 345), the Union representatives used their meetings with the Employers—which had been purportedly scheduled for impact bargaining—in significant part, as an opportunity to question the underlying decision to implement the layoffs. The Union was quite candid about that strategy in this case. During Lieutenant Milazzo's testimony at the administrative hearing, he admitted that the Union wanted to push back the effective date of the layoffs so that it would have "more time to find other proposals to offer" and that the purpose of such proposals would be to "thwart the layoffs." Even the ALJ, whose analysis the Union now urges us to affirm, acknowledged this, writing: "the Union's proposals to increase civil processing fees and conduct rapid response/active shooter training sought to bargain the layoff decision itself."

¶ 56    The Employers had no obligation to entertain these revenue-raising proposals, as they were offered as part of a deliberate strategy to reverse the decision to pursue layoffs, which is not the purpose of impact bargaining. Accordingly, the Employers' alleged failure to seriously engage with these proposals was not a failure to engage in good faith impact bargaining, and it did not constitute a violation of the Act.

¶ 57                    3. The Employers Did Not Fail To Bargain In Good Faith

¶ 58    Even though she concluded that the Union's revenue-raising proposals impermissibly sought to bargain the layoff decision itself, the ALJ nonetheless found an unfair labor practice because, in her view, other legitimate impact bargaining objectives were also discussed at these meetings. She explained that beyond the revenue proposals, "the evidence suggest[ed] that from the outset the Union was interested in negotiating over a number of matters pertaining to the effect of the layoffs on the Union members' terms and conditions of employment." Specifically, the ALJ found that the Union wished to bargain over the following three particular effects: (1) the effective date of the layoffs, (2) compensatory time and seniority after the layoffs, and (3) the assignment and reassignment of lieutenants who had not been laid off. The Union cites these three "effects" as the ones on which the Employers wrongly refused to bargain. We examine these in turn and conclude that, to the extent that any of these was a proper subject for impact bargaining, the record supports the Board's conclusion that the Employers did not fail to bargain in good faith.

¶ 59                            a. Timing of the Layoffs

¶ 60    We agree with the Board that the timing of the layoffs was an inevitable consequence of the layoff decision itself and thus not a required subject of impact bargaining. Section 8.5(a) of the CBA grants the Employers the unilateral right to pursue layoffs and specifies a two week notification period. The effective date of the layoffs, in other words, flows inevitably from the employer's decision to layoff and its obligation to notify. Thus, the timing of the layoffs, like the decision to pursue the layoffs in the first place, was not something over which the Employers had any obligation to bargain. The Union waived its right to bargain over this issue by agreeing, when it negotiated the CBA, to include the notice provision that dictated the timing for the layoffs.

¶ 61    At the request of the Union at the first meeting, the Employers agreed to push back the

effective date of the layoffs for several weeks. This does not support the Union's claim that the Employers were obligated to negotiate on this issue. If anything, it undermines the Union's assertion that the Employers acted in bad faith during these negotiations.

¶ 62                                b. Work Assignments

¶ 63     We also agree with the Board that, through the CBA, the Union had waived any right to bargain over the work assignments of the lieutenants who were not subject to the layoff. Section 3.1(C) of the CBA gave the Sheriff the right to "make work assignments" and to determine the "means and number of personnel needed to carry out the [Sheriff's] responsibilities and duties."

¶ 64     The Union's only response to the Board's reliance on this language is that this section does not specifically address the impact or effects of the lieutenants' work conditions "as a result of layoffs." The Union does not explain why any changes in work assignments that happened "as a result of layoffs" would not be covered by section 3.1(C) of the CBA. Further, the Union can point to no proposals that it made related to this subject during the three meetings between the parties. In short, we see no basis for finding that the Board clearly erred when it concluded that this section "clearly and unequivocally grant[ed] the Sheriff the right to '*** make work assignments' and determine the 'means and number of personnel needed to carry out the [Sheriff's] responsibilities and duties.' "

¶ 65            c. Compensatory Time and Seniority for Laid Off Lieutenants

¶ 66     The third area of impact identified by the ALJ and by the Union is the compensatory time and seniority for those lieutenants who were laid off and exercised their bumping rights. While the Board points to language in the CBA that broadly addresses seniority, compensatory time, and bumping rights, the Union argues persuasively that those provisions do not clearly address the rights of those laid off lieutenants who chose to exercise their bumping rights. Additionally, the

Union points out that upon exercising their bumping rights, these employees would technically no longer be members of the Policemen's Benevolent Labor Committee, since as sergeants their new bargaining representative would be the Fraternal Order of Police. But we find no clear error by the Board in rejecting the Union's argument that the Employers failed to engage in good faith bargaining on these issues.

¶ 67    At the December 28, 2019, meeting, the Union specifically asked the Employers about how the layoffs would affect the compensatory time and seniority of those lieutenants who chose to exercise their bumping rights. The Employers promised to look into it and get back to the Union. The record does not reflect any objection by the Union when it received this response. Nor does the record suggest that the Union ever made any specific proposals related to these issues. The only proposal offered by either side during their three meetings that related in any way to the rights of laid off lieutenants was the Employers' offer to extend recall rights for these employees for one year. The Union rejected this offer, without making a counterproposal. Notably, this oral proposal to extend recall rights was tendered at the third meeting between the parties, *after* the layoffs had taken effect and thus after these former lieutenants had been bumped down to sergeants, reflecting the Employers' willingness to continue to negotiate on these issues even though the impacted employees were no longer in the Union's bargaining unit.

¶ 68    As in *CMS v. ILRB*, if the Union "really wanted to bargain over the impact and effects of the layoff, it could have done so after the layoff occurred." *Id.* at 349. The record reflects that the Union made no effort to negotiate on these issues either before or after the layoffs took place and that the Employers remained open to discussing the impact of the layoffs on these employees. Thus, we find no clear error by the Board in rejecting the Union's unfair labor practices charge on this issue.

¶ 69                                    IV. CONCLUSION

¶ 70     Effects bargaining is an important Union right, but it is not a tool to derail government actions that are within the discretion of management or to delay a layoff indefinitely. On this record, the Board's finding that the Employers did not improperly fail to negotiate in good faith was not clearly erroneous.

¶ 71     For the foregoing reasons, we affirm the Board's decision dismissing the Union's charge of unfair labor practices.

¶ 72     Affirmed.

**No. 1-19-2209**

| | |
|---|---|
| **Cite as:** | *Policemen's Benevolent Labor Committee v. Illinois Labor Relations Board, Local Panel,* 2021 IL App (1st) 192209 |
| **Decision Under Review:** | Petition for Review of a Decision and Order of the Illinois Labor Relations Board, Local Panel, No.1-CA-18-037 |
| **Attorney for Appellant:** | Joseph Andruzzi of Policemen's Benevolent & Protective Association, Labor Committee, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, and Jane Elinor Notz, Solicitor General, of the State of Illinois (Valerie Quinn, Assistant Attorney General, of counsel), for State Respondent Illinois Labor Relations Board; Justin L. Leinenweber of Leinenweber Baroni & Daffada LLC, of Chicago, and Ethan E. White of Emery Law, of Oak Brook, Illinois, for respondent-appellee Sheriff of Cook County. |