2024 IL App (1st) 220541-U

Fourth Division
Filed January 11, 2024

No. 1-22-0541

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

**IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT**

| | |
|---|---|
| DAVID THERMEN, <br><br>     Plaintiff-Appellee, <br><br>   *v.* <br><br> THE DEPARTMENT OF EMPLOYMENT SECURITY, DIRECTOR OF EMPLOYMENT SECURITY, THE BOARD OF REVIEW OF THE DEPARTMENT OF EMPLOYMENT SECURITY, and WOODFIELD LEXUS, <br><br>     Defendants <br><br> (The Department of Employment Security, Director of Employment Security, and the Board of Review of the Department of Employment Security, Defendants-Appellants). | Appeal from the Circuit Court of Cook County <br><br> No. 2021 L 50306 <br><br> The Honorable Daniel P. Duffy, Judge, presiding. |

JUSTICE OCASIO III delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the circuit court's order reversing the Board's determination that Thermen was ineligible for unemployment benefits where the record shows that Thermen was discharged from employment due to misconduct.

¶ 2    Defendants Department of Employment Security (the Department), the Director of Employment Security (the Director), and the Board of Review of the Department of Employment Security (the Board) appeal the circuit court's order reversing the Board's determination that plaintiff David Thermen was ineligible for unemployment benefits. They argue that the Board committed no error in finding that Thermen was discharged due to misconduct and therefore could

not receive unemployment benefits under section 602(A)(5) of the Unemployment Insurance Act (the Act). See 820 ILCS 405/602(A) (West 2020). We reverse the circuit court's order and affirm the Board's order finding Thermen ineligible for unemployment benefits.

¶ 3    Thermen was employed by defendant Schaumburg Toyota Inc. (the employer) beginning on September 9, 2002, until he was discharged on December 21, 2020, based on an altercation with another employee. On December 27, 2020, Thermen filed a claim with the Department to receive unemployment benefits under the Act.

¶ 4    The employer protested the benefits claim, stating that Thermen was a "long-term employee who was having a physically dangerous and threatening incident once a year, beginning perhaps in 2015." The employer described two incidents occurring in 2020. During the first incident, on or about September 15, 2020, Thermen had a "heated argument," which scared other employees, and he was later "verbally warned." During the second incident, on December 21, 2020, Thermen was "especially threatening to other employees and in the view of customers." On that date, Thermen, who worked in the service department, was asked by three people to move a vehicle from a sales department staging area but refused to let it be moved, despite lacking the authority to deny another department use of the area. When supervisor Mandeep Mangat came to retrieve the vehicle's keys to move the vehicle, Thermen used "verbal[ly] abusive language, was shaking with anger and grabbed Mangat['s] hand, twisting his finger." The employer indicated to the Department that Thermen had been aware of the company policy that his actions violated and he had been warned. The employer stated that "[v]iolence like this can't be tolerated," and "his behavior had gotten more extreme and frequently bad over the years."

¶ 5    The employer provided a section of its employee handbook titled "Conduct in the Company," which stated: "Consideration for the rights of others requires that an employee

conduct himself or herself in a respectable and orderly manner." The policy further stated: "Any conduct which is determined to be against the Company's interests, including, but not limited to, vulgarity, fighting, *** interference with fellow workers through horseplay and other objectionable or immoral conduct, will not be tolerated under any circumstances." On March 23, 2017, Thermen signed an "acknowledgment of receipt," acknowledging that he had "received and reviewed the employee handbook" and understood that "the rules, policies and procedures contained in it govern [his] employment."

¶ 6    The employer provided the Department with a handwritten document signed by Mangat describing the December 2020 incident. The employer also provided a handwritten statement from its employee Alexis Bueno, which stated that she saw Thermen grab Mangat's wrist after Mangat had asked Thermen to move a vehicle and picked up keys. An employee report dated September 21, 2017, and signed by Thermen, stated that Thermen put his name on a service ticket that was filled out by another employee so that Thermen would make the commission. The report stated that "[m]any employees complain about negative & unprofessional interactions w/ [Thermen] on a day to day basis" and that any further incidents would result in termination.

¶ 7    A "Notification of Verbal Reprimand" dated April 12, 2018, and signed by Thermen, described an incident in March 2018 where a customer witnessed a "heated and unprofessional" exchange between Thermen and a coworker. The notification stated, "If there are questions on writing customer work & 'we-owe' work and which employee gets the credit, take the issue to your supervisor instead of an escalation with a co-worker."

¶ 8    On December 29, 2020, the Department mailed Thermen a notice of interview, indicating that a telephone interview was scheduled for January 11, 2021. The notice stated that an interview

- 3 -

was necessary for Thermen to "supply information regarding 602(A)" and that "[m]isconduct applies to [his] eligibility."

¶ 9    On January 12, 2021, the Department issued its claims adjudicator's determination that Thermen was ineligible for benefits under section 602(A)(5) of the Act because he was discharged for misconduct connected with his work. The claims adjudicator found that "[t]he evidence shows the claimant was discharged *** because of a verbal altercation with a coworker, which became physical when he grabbed the coworker's wrist in order to wrestle the keys away from him." The claims adjudicator noted that the reason Thermen was discharged "constituted a violation of a known and reasonable company rule." In so finding, the adjudicator quoted in its entirety the statutory definition of "misconduct" set forth in section 602(A) of the Act, along with quoting all eight subsections setting forth work-related circumstances of misconduct.

¶ 10    Thermen filed a request for reconsideration of the claims adjudicator's determination with the Department, stating that he disagreed with the decision "regarding section 602A, there was no physical altercation at all." On February 11, 2021, the Department mailed to Thermen a notice of reconsideration and appeal stating that an appeal had "been filed to the Referee." The notice quoted section 602(A) in its entirety, including all eight subsections.

¶ 11    On February 16, 2021, the Department mailed to Thermen a notice of telephone hearing, setting a telephone hearing before a referee for February 26, 2021. The notice identified the issues to be considered at the telephone hearing, including, *inter alia*, whether any discharge was "for misconduct in connection with the work." The notice also referenced section 602(A) of the Act.

¶ 12    The record includes a transcript of the telephone hearing and reflects that the participants before the referee included Thermen and, for the employer, third party administrator Cary Miller,

service manager Mangat, service porter Bueno, human resources employee Debra Brown, and service director Matt Oner. Thermen was represented by counsel.

¶ 13    At the commencement of the hearing, the referee identified the issue as "misconduct" under "Section 602(A)" of the Act. The specific questions were whether "there [was] a discharge" and, if so, whether that discharge was "for misconduct connect[ed] with work." The referee defined "misconduct" as "a willful and deliberate violation of a company policy."

¶ 14    Mangat testified that on December 21, 2020, he was Thermen's supervisor. That day, he went to Thermen's office and asked him to move a vehicle from a stall that belonged to another department. Thermen refused to move the vehicle. Mangat offered to help Thermen use a different stall to work on the vehicle, but Thermen refused. Mangat then told Thermen, "[I]n that case, I'm going to grab the keys from your desk and then I'll have *** one of the porter[s] *** move the car." Thermen walked away from Mangat toward the office door and then "came back *** fast," "grabbed" Mangat's hand, "twisted" it, took the keys from Mangat's hand, and walked away "yelling and screaming." Thermen screamed "really loud" and used profanity while customers stood outside. Mangat told Thermen he needed to "take it easy" and could not yell at him. Mangat told Oner what happened, and Oner called human resources.

¶ 15    Brown testified that Oner informed her of the incident, which she investigated. At about 11 a.m. that same day, she spoke with Thermen about the incident in Oner's presence. Brown did not take any notes and could not recall exactly how Thermen responded but that he was "very emotional." She testified that Thermen admitted to "taking the keys back." Brown stated that Thermen was discharged for violating the employer's "conduct in the company" policy, namely, for "us[ing] force and physically twist[ing] another co-worker['s] finger to take away keys" and

"using [an] aggressive and loud tone of voice" while customers were nearby. Brown could not identify any prior warnings Thermen received for misconduct in the last 12 months.

¶ 16    Bueno testified that she was working at the desk when the incident occurred. From about four or five feet away, she heard Thermen yelling, turned around, and saw Thermen put his hands on Mangat's hand. Bueno saw "it was getting a little out of control." She walked away because she needed to help the customer she was with, and she "didn't want to be involved in anything[] like that."

¶ 17    Oner testified that had been a service director with the employer for about 1½ years and that Thermen had been working for the employer for about 19 years. Oner was present during the discharge meeting with Thermen and Brown. Thermen admitted that he yelled and was in an argument, but never admitted to grabbing Mangat's hand "or anything like that."

¶ 18    Oner also testified that he had verbally warned Thermen before about his temper and "certain situations that had occurred." During Oner's time as service director, he had spoken with Thermen about his temper about three times, and "probably" two of the conversations related to Mangat. Oner would "always" instruct Thermen that any issues with coworkers needed to be raised with Oner first and not the coworker. After the conversations, Thermen's conduct would "be okay" at first, but then issues would start to "happen again and again." Oner testified that, during Thermen's time working there, Thermen would yell at coworkers, and they would "brush *** it off" because "that's just how [Thermen] has been." However, "when it gets into physical contact, that's a different category." Oner testified that Thermen and Mangat "have been at this in the past." Mangat was soft-spoken, and Thermen was "more of a vocal person" and would address disagreements with Mangat by arguing.

¶ 19    Thermen testified that he began working for the employer as a service adviser. Around 2017, he took an assistant manager position and was responsible for reconditioning used vehicles and getting new vehicles ready for delivery. On December 21, 2020, Mangat was "the assistant manager" and Oner's "second hand." Oner was Thermen's immediate supervisor.

¶ 20    Thermen testified that he and Mangat "had a verbal altercation" on December 21, 2020, but that "there were no physical altercations." He elaborated that, at about 9:15 a.m. on December 21, 2020, Mangat entered his office and told him about the vehicle that needed to be moved from an area. Thermen explained that he needed that area and could not move the vehicle at that time but that he could come up with a solution. Thermen did not move the vehicle when asked because he believed he needed the area, did not know another area was available, and needed time to resolve the issue. In the meantime, Mangat grabbed from Thermen's desk a set of keys belonging to a different vehicle. The correct keys were in Thermen's pocket. Thermen tried to explain to Mangat that he had the wrong keys and "may have" yelled because he is "a very loud, vocal person *** by nature." Mangat "wasn't listening to what [he] had to say *** when [he] was explaining [it] to him." Thermen testified that he never took the keys out of Mangat's hand, as Mangat put the keys back on Thermen's desk after being told he had the wrong keys. No one else was present during the incident, and there were no coworkers or customers in the vicinity.

¶ 21    Thermen went to Oner and said they had to get the vehicle moved because the sales company needed it. They moved the vehicle to the head technician's stall and "had worked [it] out at the end."

¶ 22    At about 3 p.m., Oner and Brown entered Thermen's office. Brown told Thermen they were "separating ways" with him because of a physical altercation with Mangat. Thermen testified he was "shocked" because no physical altercation occurred. He testified that neither Oner nor

Brown interviewed or questioned him about the incident before the meeting. When asked about Oner speaking to him previously regarding his temper, Thermen stated he remembered discussing Mangat with Oner. Thermen stated Mangat was not following "proper procedure regarding owner vehicles" and, as a result, Thermen would need to determine where vehicles were when they and the keys went missing. Thermen denied being told his job could be in jeopardy if his temper did not improve; he was told to "relax and calm down." Thermen testified he was "very passionate" about his job and took it "very seriously."

¶ 23    On March 1, 2021, the referee issued a decision setting aside the Department's determination and finding that no disqualification under 602(A) of the Act applied because Thermen was discharged for reasons other than misconduct connected with work. The referee concluded that the altercation in question did not establish a "willful and deliberate violation of the employer's policies," and the allegation of force and physical altercation was not substantiated. The referee found "[t]his was an isolated event caused by poor judgment," and there was "no intent to cause harm to the manager or disregard company policy." The referee determined that Thermen was eligible for benefits from December 27, 2020.

¶ 24    On March 7, 2021, the employer filed an appeal with the Board from the referee's decision. The notice of pending appeal referenced section 602(A) and misconduct as the issue.

¶ 25    On June 4, 2021, the Board issued a final administrative decision setting aside the referee's decision and finding Thermen ineligible for benefits. In so finding, the Board stated that the record adequately set forth the evidence and no further evidentiary proceedings were necessary. The Board quoted section 602(A)'s definition of the term "misconduct" and subsection (A)(5) in its entirety, which stated that "[r]efusal to obey an employer's reasonable and lawful instruction, unless the refusal is due to the lack of ability, skills, or training for the individual required to obey

the instruction or the instruction would result in an unsafe act." The Board, citing *Persaud v. Illinois Department of Employment Security*, 2019 IL App (1st) 180964, stated that subsection (A)(5) imposed a "lower threshold" for finding that an employee was discharged based on misconduct, as proof was no longer required that the employee's actions be "willful or deliberate," that the employer was harmed, or that the employee's conduct was repeated or in violation of a reasonable work-related rule.

¶ 26    The Board noted that Thermen admitted he may have raised his voice during the incident and had been spoken to about his interactions with Mangat, but he denied knowing that his job was in jeopardy. The Board found it was "more likely than not" that Thermen had yelled at Mangat, which violated the instructions he received to report any issues with others to the director instead of handling the issues himself. The Board therefore found Thermen was not eligible for unemployment benefits because he was discharged based on misconduct connected with work as defined under subsection 602(A)(5) of the Act.

¶ 27    On July 9, 2021, Thermen filed with the circuit court a *pro se* complaint for administrative review.

¶ 28    On March 25, 2022, the circuit court entered an order reversing the Board's decision. The court stated that the Board's review of the referee's determination was a "frank violation of [Thermen's] due process rights," as the Board had "cast the Referee's decision aside in favor of an entirely different analysis governed by new subsection (A)(5) without providing [Thermen] notice and opportunity to be heard on that issue." The circuit court found that the record was "wholly undeveloped" regarding the new legal standard set forth in subsection (A)(5), which had not been mentioned at any point during the claims adjudication process or the appeal to the referee. The court held that the Board erred in finding Thermen ineligible for unemployment benefits.

¶ 29    The Department, the Director, and the Board filed an appeal from the circuit court's decision, requesting that this court reverse and vacate the circuit court order and reinstate the Board's decision finding Thermen ineligible for unemployment benefits. They argue that the Board did not err in finding Thermen ineligible for benefits under section 602(A)(5) of the Act where he had an altercation with Mangat in violation of his supervisor's instruction to report to him any issues Thermen had with coworkers and was informed that misconduct under section 605(A)(5) was at issue before the Board.

¶ 30    Thermen has neither appeared in this appeal nor filed a response brief. On March 6, 2023, this court entered an order taking the case on the record and the appellants' brief only. See *McHenry Township v. County of McHenry*, 2022 IL 127258, ¶ 48 ("In the absence of an appellee's brief, a reviewing court should address an appeal on the merits where the record is simple and the claimed errors are such that the court may easily decide the issues raised by the appellant.").

¶ 31    The Act "provides economic relief to those who are involuntarily unemployed, through the collection of compulsory contributions from employers and the payment of benefits to eligible unemployed persons." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 396 (2001); see also 820 ILCS 405/100 (West 2020) (declaration of public policy for the Act). the Department is "entrusted with administering the Act, preserving the fund, and handling its assets in accordance with the Act." *Petrovic v. Department of Economic Security*, 2016 IL 118562, ¶ 19; 820 ILCS 405/1700, 2100(A) (West 2020). Where a claimant seeks to receive unemployment benefits under the Act, a claims adjudicator shall determine the claimant's eligibility for the benefits. 820 ILCS 405/702 (West 2020). The claimant bears the burden of establishing eligibility for unemployment benefits under the Act. *White v. Department of Employment Security*, 376 Ill. App. 3d 668, 671 (2007).

¶ 32    Appeals from a claims adjudicator's determination of eligibility under Section 602(A) are taken to a referee, who shall afford the parties an opportunity for a hearing and may affirm, modify, or set aside the claims adjudicator's decision. 820 ILCS 405/800, 801 (West 2020). The Board may then, on its own motion or upon appeal by a party, affirm, modify, or set aside any decision of a referee. 820 ILCS 405/803 (West 2020). Any decision of the Board is reviewable "only under and in accordance with" the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)), provided that judicial review is permitted only after the aggrieved party has exhausted his administrative remedies as provided under the Act. 820 ILCS 405/1100 (West 2020).

¶ 33    We review the final decision of the Board, rather than the decision of the referee or circuit court. *Petrovic*, 2016 IL 118562, ¶ 22. The Board's determination is deemed *prima facie* correct, and the person seeking review bears the burden to establish the contrary. 820 ILCS 405/2303 (West 2020). When examining an agency's factual findings, we will not substitute our judgment for that of the agency. *Persaud*, 2019 IL App (1st) 180964, ¶ 14. Nor will we judge the witnesses' credibility or resolve conflicts in testimony. *White*, 376 Ill. App. 3d at 671. "We merely determine whether the agency's findings of fact are against the manifest weight of the evidence," more specifically, whether "the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Persaud*, 2019 IL App (1st) 180964, ¶ 14. We review *de novo* the Board's legal determinations. *Id.* ¶ 15.

¶ 34    Our review of the Board's determination to deny unemployment benefits under the Act due to an employee's discharge for misconduct involves a mixed question of law and fact. *Petrovic*, 2016 IL 118562, ¶ 21. When presented with a mixed question of law and fact, we must determine the legal effect of a given set of facts. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). We review mixed questions under the "clearly erroneous" standard,

which is less deferential to the administrative agency than the manifest weight of the evidence standard. *Petrovic*, 2016 IL 118562, ¶ 21. "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393.

¶ 35 Here, we must determine whether the Board's finding that Thermen was ineligible for benefits because he was discharged for misconduct under section 602(A)(5) of the Act was clearly erroneous. Under section 602(A), an employee is ineligible for unemployment benefits if discharged for "misconduct." 820 ILCS 405/602(A) (West 2020); *Petrovic*, 2016 IL 118562, ¶ 24. Section 602(A) generally defines "misconduct" as "the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit." 820 ILCS 405/602(A) (West 2020).

¶ 36 Section 602(A) was amended in 2016, prior to Thermen filing his claim with the Department, to explicitly enumerate eight categories of misconduct for which an employee may be deemed ineligible for benefits. Pub. Act 99-488, § 5 (eff. Jan. 3, 2016) (amending 820 ILCS 405/602(A)). As relevant here, subsection 602(A)(5) states that "[t]he previous definition notwithstanding, 'misconduct' shall include *** [r]efusal to obey an employer's reasonable and lawful instruction, unless the refusal is due to the lack of ability, skills, or training for the individual required to obey the instruction or the instruction would result in an unsafe act." 820 ILCS 405/602(A)(5) (West 2020).

¶ 37    In this context, "notwithstanding" means "independent of the previous definition, 'in spite of' the previous definition, an 'exception' to the general definition." *Persaud*, 2019 IL App (1st) 180964, ¶ 21. Thus, "notwithstanding" section 602(A)'s general definition of misconduct, "certain actions are deemed to be misconduct *per se*," including the actions set forth in subsection (A)(5). *Id.* ¶¶ 21-22. In other words, subsection (A)(5) of section 602 sets forth "an independent example of one particular type of 'misconduct.' " *Id.* ¶ 22.

¶ 38    An employee's misconduct under subsection (A)(5) of section 602 "does not require willfulness, harm to the employer, or repetition." *Id.* The only exceptions to a finding of "misconduct" under section 602(A)(5) are "(1) if the reasonable and lawful instruction could not be followed by the employee due to lack of ability, skills, or training, or (2) if the instruction would require an unsafe act." *Id.* For an instruction to be reasonable, it must "appropriately relate to the workplace" and concern "standards of behavior which an employer has a right to expect from an employee." (Internal quotation marks omitted.) *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 827 (2009). The burden of establishing an employee's disqualification for benefits based on misconduct rests upon the employer. *Petrovic*, 2016 IL 118562, ¶ 28.

¶ 39    In this case, we find no clear error in the Board's determination that Thermen was ineligible for unemployment benefits because he was discharged for misconduct. First, the Board's factual finding that Thermen disobeyed an instruction to report issues with coworkers to his supervisor was not against the manifest weight of the evidence. We note that the employer's written employee policy addressing "conduct in the company" prohibited "vulgarity, fighting, *** interference with fellow workers through horseplay and other objectionable or immoral conduct." Thermen signed an acknowledgment that he received the written policy handbook and understood the policies therein governed his employment.

¶ 40    The record shows that Thermen's immediate supervisor, Oner, had verbally warned Thermen several times about his conduct with coworkers and, specifically, regarding his interactions with assistant manager Mangat. Oner "always" instructed Thermen to bring any issues with coworkers to him rather than the coworker. Such an instruction was reasonable, as this court has recognized that "the use of hostile and intimidating language to a coworker could adversely affect the work environment." *Manning v. Department of Employment Security*, 365 Ill. App. 3d 553, 558 (2006). Nonetheless, on the date of the incident, when Mangat entered Thermen's office and asked him to move a vehicle, Thermen refused to comply. Rather than bringing his issue with Mangat to Oner, Thermen, by his own admission, had a "verbal altercation" with and "may have" yelled at Mangat. Both Mangat and coworker Bueno testified that Thermen yelled during the incident and put his hands on Mangat's hand.

¶ 41    Second, the record supports the Board's factual finding that Thermen's conduct amounted to a refusal to obey his employer's reasonable instruction to report issues with coworkers to his supervisor instead of handling them directly. There is no indication from the record that Thermen's refusal to obey his employer's instructions was "due to the lack of ability, skills, or training for the individual required to obey the instruction or the instruction would result in an unsafe act." 820 ILCS 405/602(A)(5) (West 2020). We therefore cannot find that the evidence in the record leaves us with a "definite and firm conviction that a mistake has been committed" in the Board's factual findings. (Internal quotation marks omitted.) *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393.

¶ 42    Having found that the Board's factual findings were not against the manifest weight of the evidence, we next turn to the legal question of whether the Board's application of the statutory definition of misconduct was correct. We find that it was.

¶ 43    As we have stated, the Board found that Thermen was discharged for misconduct under section 602(A)(5) of the Act, which defines misconduct to include a "[r]efusal to obey an employer's reasonable and lawful instruction, unless the refusal is due to the lack of ability, skills, or training for the individual required to obey the instruction or the instruction would result in an unsafe act." 820 ILCS 405/602(A)(5) (West 2020).

¶ 44    In this case, the Board correctly determined that the plain text of section 602(A)(5) does not require an employee's refusal to obey a reasonable instruction to be willful or deliberate. Nor does it require proof of harm to the employer, that the conduct was repeated, or that the conduct violated a reasonable work-related rule. *Persaud*, 2019 IL App (1st) 180964, ¶ 21. While those requirements apply to the general statutory definition of misconduct under section 602(A) of the Act, subsection (A)(5) gives an "independent example" of one particular type of *per se* misconduct that does not contain the same elements as the general definition. *Id.* ¶ 22. The Board correctly interpreted section 602(A)(5) as such.

¶ 45    Thermen was repeatedly instructed to bring any issues with coworkers to his supervisor. However, he disobeyed the instruction by engaging in an altercation with a coworker over a work-related disagreement. The Board properly found that this amounted to a refusal to obey the employer's reasonable and lawful instruction, and that Thermen therefore was ineligible for unemployment benefits as he was discharged for misconduct under section 602(A)(5) of the Act. We conclude that the Board's determination that Thermen was ineligible for unemployment benefits was not clearly erroneous.

¶ 46    We next address the circuit court's finding that Thermen was denied due process when the Board applied the section 602(A)(5) definition of misconduct. We recognize that our role on appeal is to review the decision of the Board, not that of the circuit court. *Petrovic*, 2016 IL 118562, ¶ 22.

However, "we have a duty to examine the proceedings at an administrative hearing to ensure that the proceedings were fair and impartial." *Leach v. Department of Employment Security*, 2020 IL App (1st) 190299, ¶ 29; see *Matlock v. Illinois Department of Employment Security*, 2019 IL App (1st) 180645, ¶ 27 ("The reviewing court has a duty to examine the procedural methods employed at the administrative hearing to ensure that a fair and impartial procedure was used.").

¶ 47 The circuit court found that the Board denied Thermen his right to due process by determining that he was discharged for misconduct under the less onerous definition of misconduct set forth in subsection 602(A)(5) rather than the general definition of misconduct set forth in section 602(A), which the referee adopted. The court reasoned that Thermen did not receive notice and a hearing regarding the specific language of section 602(A)(5) prior to the Board's determination based on that section.

¶ 48 Thermen's due process rights were not violated. Throughout the proceedings and prior to the appeal hearing before the referee, the Department notified Thermen that the relevant issue was whether his conduct constituted misconduct under section 602(A), which had already been amended to include the *per se* categories of misconduct. Multiple notices that the Department sent to Thermen, including the notice of reconsideration and appeal to the referee, expressly listed the eight *per se* categories of misconduct, including the category of misconduct set forth in subsection 602(A)(5). Thus, the record shows that Thermen had been notified repeatedly that the issue before the agency concerned misconduct under section 602(A) in its entirety, *i.e.*, under all of the categories of misconduct set forth in the statute including section 602(A)(5), and he was afforded an opportunity to be heard thereon. We therefore find that no due process violation occurred during the administrative proceedings.

¶ 49    For the foregoing reasons, we reverse the circuit court's order that reversed the Board's decision to deny Thermen unemployment benefits under the Act and affirm the Board's decision finding Thermen ineligible for unemployment benefits.

¶ 50    Circuit court judgment reversed.

¶ 51    Board decision affirmed.